726 A.2d 818

**Allen Bruce HOLZMAN, et ux.**

v.

**FIOLA BLUM, INC.**

**No. 570, Sept. Term, 1998.**

Court of Special Appeals of Maryland.

April 2, 1999.

604

606

Allan P. Feigelson, Laurel, for Appellant.

Gerson B. Mehlman (Francis X. Leary and Mehlman & Greenblatt, L.L.C., on the brief), Baltimore, for Appellees.

Argued before HARRELL, HOLLANDER, and BYRNES, JJ.

HOLLANDER, Judge.

This appeal arises from an action instituted in the Circuit Court for Baltimore County by Fiola Blum, Inc. ("Blum" or the "Broker"), appellee and cross-appellant, against Allen Bruce Holzman and his wife, Terry Lee Holzman (the "Holzmans" or the "Sellers"), appellants and cross-appellees. Blum sought to recover a real estate broker's commission allegedly owed pursuant to a Listing Agreement executed by the parties for the sale of appellants' residence. Following a bench trial, the court found appellants liable to the Broker for a commis-

sion of $37,600. In addition, the court awarded the Broker the sum of $12,408 as a reasonable attorney's fee. Thereafter, pursuant to appellants' motion to alter or amend the judgment, the court reduced the judgment of $50,008.00 by the amount of $21,500, which was equal to the commission paid to the Broker in connection with the subsequent sale of the residence.

On appeal, appellants present the following questions for our review, which we have reformulated:

I. Did the circuit court err in determining that, pursuant to the Agreement, Blum was entitled to a commission even though a contract of sale for the Property did not proceed to settlement?

II. Did the circuit court err in concluding that the contract of sale for the Property, which provided that the buyers were to pay the Broker's commission, did not relieve the Sellers of their obligation to Blum under the Agreement?

III. Did the circuit court err in concluding that the Broker was entitled to a commission when Blum breached its fiduciary duty and the Broker's conduct constituted estoppel?

IV. Did the circuit court err in its award of attorney's fees?

Pertinent to its cross-appeal, Blum asks the following question, which we have also rephrased:

Did the trial court err in reducing the judgment by the amount of the commission earned by the Broker in connection with a subsequent contract of sale for the Property?

For the reasons that follow, we perceive error only with respect to the amount of the attorney's fees awarded to Blum. Therefore, we shall affirm the portion of the judgment concerning the commission, vacate the portion of the judgment regarding the attorney's fees, and remand for further proceedings.

## Factual Summary

Appellants were the owners of 12500 Fellowship Court (the "Property"), an exclusive, three-story brick house containing eight bedrooms, nine full baths, three half baths, and a pool, located on several acres of land in an area of Baltimore County known as Worthington Club Estates. Appellants were interested in selling the Property and, on January 23, 1996, they met with Hope Berman, a real estate agent associated with Blum, and Harry Blum, the president of appellee, at the Property. During that visit, appellee, by Mr. Blum, and appellants executed a Listing Agreement (the "Agreement") for the residence, which was effective for a six month term.

The Agreement, a standard form "Exclusive Right to Sell Listing Contract," provided, in pertinent part:

Owner agrees to pay Broker a fee for services rendered in the amount set forth below (the "fee") (a) if during the term of this Contract, or any extension, thereof: (i) Broker produces a customer to purchase the Property at the listing price and on the terms herein or at such other price or on such other terms as shall be accepted by Owner or agreed upon in writing between Owner and Broker (the "authorized price"); or (ii) Owner shall enter into a written agreement to sell, exchange, convey or transfer the Property to any person or entity whether such person or entity shall have been procured by the Broker, by Owner, or by any other person or entity, in which event Owner shall within seventy-two (72) hours thereof furnish Broker a copy of such written agreement procured by anyone other than Broker; or (b) if, during the period of *six (6)* months following the expiration or termination of this Contract, Owner shall enter into a written agreement to sell, exchange, convey, or transfer the Property to any person or entity which, with the knowledge of Owner or any agent of Owner, inspected or made inquiry about the Property or negotiated to purchase or exchange the Property during the term of this Contract or extension thereof ... except that Owner shall have no obligation to pay the fee to Broker if the Property is sold or exchanged by any other licensed real estate broker following the

expiration of this Contract or any extension thereof or following the termination of this Contract as herein provided, unless such termination by Owner shall have been made for the purpose of avoiding the obligation of the Owner to pay the fee to Broker.

\* \* \*

If Broker prevails in any court action brought to obtain payment of the fee, Broker shall also be entitled to recover in such action his/her reasonable attorney's fees and court costs.

The Property was initially listed for sale on January 23, 1996 at a price of $1.95 million. Later, the price was reduced to $1,650,000. Under the Agreement, the Broker's commission was to be calculated in the following way: six percent of the first $300,000 of the selling price, five percent of the second $300,000, and four percent of the balance.

On July 19, 1996, the Agreement was extended until September 30, 1996; the Holzmans, Mr. Blum, and Ms. Berman signed the extension. On August 9, 1996, appellants received a letter of intent from Gil Stern and his wife, Ellen (the "Sterns"), offering $600,000 for the Property. On August 12, 1996, Heros Noravian and his wife, Dr. Emma Zargarian (the "Noravians" or the "Buyers"), submitted a letter of intent, offering a purchase price of $715,000 and a deposit of $10,000.

Appellants negotiated with the Noravians, and appellee then prepared the residential contract of sale ("the Noravian contract"). On August 20, 1996, while appellants "were still in negotiation with the Noravians", the Broker presented appellants with a revised offer from the Sterns in the amount of $850,000. Nevertheless, appellants and the Buyers executed the Noravian contract on August 25, 1996. The record does not reflect why the Holzmans proceeded with the Noravian contract after they learned of the increased offer from the Sterns.

On the advice of their attorney, appellants included a default provision in the Noravian contract which provided that,

in the event of a breach by the Sellers, the Buyers' sole remedy would be limited to a refund of their deposit. The Noravian contract also contained a handwritten addendum (the "Addendum") that provided, in part: "2. It is understood and agreed that buyers are to pay [the Broker's] real estate commission fee and also pay all settlement fees...." Because there was no cooperating agent for the Noravian contract, any commission due under the Agreement was payable solely to appellee.

After appellants executed the Noravian contract, they decided to pursue the Sterns' offer, relying on the advice of counsel. Accordingly, on August 26, 1996, just one day after signing the Noravian contract, appellants canceled it. On the same day, appellants notified appellee and Ms. Berman of their decision, via a signed facsimile letter, which provided:

We have decided not to make full settlement of our contract with Emma Zargarian and Hero[s] Noravian (the Buyers) accepted on August 25, 1996, based on the Default paragraph (paragraph number 17).

Please inform the Buyers of this action immediately.

Please return any and all deposit money which the Buyers have forwarded.

The Holzmans also sent a second letter to appellee, by facsimile, on August 26, 1996, which stated:

Base[d] on our letter of August 26, 1996, faxed to you today, please inform all Brokers and Agents that 12500 Fellowship Court is available for sale.

Ms. Berman continued to list the Property for sale after receiving the facsimile letters from appellants.

Thereafter, on October 16, 1996, appellants executed a contract of sale with the Sterns (the "Stern contract"). It contained a provision to pay the real estate commissions to appellee and Long & Foster, the Sterns' real estate agent, calculated in accordance with the terms of the Agreement. Consequently, the commission due under the Stern contract was to be divided evenly between appellee and Long & Foster.

On November 7, 1996, appellee filed a complaint in the circuit court, claiming that appellants defaulted on the Noravian contract and owed the Broker the real estate commission. Appellee alleged that appellants had "failed to perform their obligation to pay the ... fee," and breached "the Exclusive Right to Sell listing contract and/or the Residential Contract of Sale."

The matter proceeded to trial on February 10, 1998. At the proceeding, appellee presented testimony from Ms. Berman and Mr. Blum.

Ms. Berman testified that, based on the sales price of $715,000 for the Noravian contract, the Broker's commission was $37,600. She conceded that she "never told" the Holzmans that they were liable for payment of the commission under the Noravian contract. Furthermore, she testified that, in her seven years as a real estate agent, she had never received a commission for a sale that did not proceed to settlement.

In his testimony, Mr. Blum acknowledged:

*I had a fiduciary relationship to the Holzmans,* my listing contract until that time ran out, I was working for them. We would bring all the offers regardless of whether there was a contract in force or not, we would bring all letters of intent regardless of whether there is a contract or not. That's our job. *And my relationship was to do the best that we could for Mr. and Mrs. Holzman.*

(Emphasis added). Nevertheless, Mr. Blum acknowledged that, when the Holzmans decided to pursue the Sterns' offer, he did not advise them about their obligation to pay the commission under the Noravian contract. Indeed, Mr. Blum testified that he was "advised by ... [counsel] not to say anything to the Holzmans."

With respect to the terms of the Agreement, Mr. Blum explained that the Agreement was read aloud to appellants before it was signed. Although Mr. Blum could not recall whether the Holzmans asked any questions concerning the Agreement, he maintained that the Agreement "wasn't unfa-

miliar to Mr. Holzman. He had signed one previously.... With another agency." When appellants' counsel inquired what form was used by the other agent, Mr. Blum said: "I take for granted they used the same form we did. I don't know, I have never seen one."

In the defense case, Mr. Holzman stated that, in connection with the Agreement, Mr. Blum "told [him] that commissions were paid upon settlement." Moreover, Mr. Holzman disputed Mr. Blum's contention that the Agreement had been read aloud. Mr. Holzman averred: "He [Mr. Blum] handed it [the Agreement] to me, explained the commissions again were paid upon settlement. And asked me to read it over and sign it."

With regard to the initial offers from the Noravians and the Sterns, Mr. Holzman claimed:

> They [Ms. Berman and Mr. Blum] basically told us that they were the best offers available. They indicated that they could not provide us with better offers, that that's the value of the property, that they also discussed prior dealings that they had with the Sterns. And told us that we had to sign that within, right then and there and without much choice at all.

Concerning the Stern contract, Mr. Holzman indicated that the parties were planning to settle "within a week" of trial; he explained that the parties had not yet settled because they were waiting for Mr. Blum to provide the release from the Buyers or the canceled check, showing that they had received the refund for their deposit.[1]

At the conclusion of the trial, the court stated:

> The court finds the following facts have been proven by a preponderance of the evidence. [Appellants] entered into an exclusive right to sell listing contract on January 23, 1996 with [appellee]. This contract was extended in July 1996 and was in effect up till sometime in September of 1996. The contract provides that the Holzmans will have to pay a

---

1. On cross-examination, Mr. Blum conceded that the Noravians did not receive their refund until September 4, 1996.

commission to ... [appellee] in the amount listed in the contract, 6% of the first $300,000, 5% of the next $300,000, and then 4% of above and beyond that.

The contract provides that the Holzman's [sic] shall have to pay this commission if they enter into a written agreement to sell the property to any person during the term of this exclusive agreement listing agreement. A contract was entered into ... during the time that the exclusive right to sell contract was in effect. The contract selling price was $715,000.

\* \* \*

Apparently, [appellants] took the time to consult with a lawyer prior to signing this contract [of sale]. And unfortunately they didn't take the time, or there has been no testimony that they took the time to consult with a lawyer prior to signing the exclusive right to sell listing contract, which they signed. Had they consulted with a lawyer the lawyer would have told them that it's unambiguous, that this exclusive right to sell listing contract ... which by the way this court recognizes, quite frankly, as the standard listing contract if you deal with a multiple listing agent.

\* \* \*

The lawyer would have told [appellants] that if you enter into a contract during the term of this listing agreement you are obligated to pay a commission.

Now, the contract [of sale] that ... [appellants] signed, because they chose to sign it, provided a provision in it that if they defaulted on the contract between themselves and ... [the] Noravian[s] the only remedy the ... Noravians would have would be the return of the $10,000 deposit, which they made. This is not a contract between [appellants] and [appellee] .... [the Broker] isn't a part of that contract. They are not parties to that contract.

Nowhere in this does it say anything about doing away with the agreement, the contract that they made to pay the

commission. Nowhere, no mention of it, and as a practical matter this contract ... is not a contract in which they could have written in there about doing away with their obligation to pay the commission unless ... [appellee] was a party to the contract.

They are not listed anywhere here. They didn't sign this. They didn't have to agree to anything. They don't have to keep reminding [appellants], oh, by the way, you know, you signed a contract with us and ... you owe us money. It's plain. He owes the money. Whether or not this property will ever settle in regard to the ... Sterns, is a matter of mere speculation....

Apparently, it hasn't. It's now February 10, 1998 and it hadn't settled as of this minute. It will be an interesting question when and if it settles what [appellee] would be entitled to based on the decision that the court will make today. That's an interesting legal question. But this is easy. I mean, quite frankly, this isn't hard legally.

The court orders that judgment be entered in favor of [appellee] against [appellant] in the amount of $37,600. Plus attorney's fees. The testimony that was given is that it is a one-third contingency. Now, the contract that was entered into calls for reasonable attorney's fees. Is that a reasonable fee? One-third of $37,600. That clearly is the price that ... [the Broker] is going to have to pay the attorney. Is that amount $12,408 unreasonable? I can't say that it's unreasonable.

\* \* \*

I think it's a reasonable arrangement to make with an attorney. I don't think that it's out of the ordinary.... So, the bottom line is, the Clerk is instructed to enter judgment in favor of [appellee] against [appellants] for $50,008....

On February 12, 1998, two days after trial, appellants and the Sterns settled on the Property. As a result, appellee received a commission of $21,500.00. Accordingly, appellants filed a revisory motion, asking the court to reduce the judg-

ment by the amount of the commission that appellee actually recovered. In its opposition, the Broker contended that it was entitled to two commissions. The following colloquy at the motion hearing is pertinent:

[APPELLEE'S COUNSEL]: We don't believe they're entitled to the credit. The listing contract doesn't require a fee when the property is sold. It requires a fee when a contract is entered into. The second contract was covered by the listing agreement and we're entitled to a fee for both.

THE COURT: Under what theory?

Let's say there was a contract for $100,000 and that contract didn't go through, and the property was then sold for $100,000 to somebody else. The property is worth $100,000. He gets commissions on both hundred thousand dollars?

[APPELLEE'S COUNSEL]: Your Honor, the way that the listing agreement read, it's a listing producing a buyer. Not on consummation of the settlement, but making the contract itself. It says that settlement is not a condition precedent to compensation due to the broker.

Thereafter, the court determined that appellants were entitled to a credit of $21,500, representing the amount paid to appellee as a commission for the Stern contract. The court said:

THE COURT: Okay. The Court rules that ... [appellant] is to be given credit against the judgment that I ordered in the amount of $50,008. . . .

\* \* \*

I am not reducing the judgment. I think the judgment I imposed—I've not been convinced that I made a mistake in ordering the judgment that I ordered. I think it was correct. I do think that ... [appellant] gets credit towards that judgment of $21,500 that has been paid as commission to [appellee] for the sale of this property.

We shall include additional facts in our discussion of the issues.

## Discussion

### I. The Agreement

Appellants contend that settlement on the Noravian contract was a condition precedent to appellee's entitlement to a commission. Appellants focus on the following language of the Agreement concerning commissions:

> Owner agrees to pay Broker a fee ... if during the term of this Contract, or any extension thereof ... Broker produces a customer to purchase the Property at the listing price and on the terms herein or at such other price or on such other terms as shall be accepted by Owner or agreed upon in writing between Owner and Broker....

Appellants posit that the Noravian offer was for a purchase price substantially below the listed sales price, and the Noravian contract was not finalized. Therefore, they claim it was not a contract "at such other price or on such other terms as shall be accepted by the owner." Moreover, appellants point out that, if we were to construe the Agreement in accordance with appellee's position, the Broker would theoretically be entitled to an unlimited number of commissions, so long as the sale was not consummated; the mere signing of a contract of sale would generate the right to the commission.

Appellants also contend that it is unfair to base liability upon the mere execution of the Noravian contract, because a number of contingencies might have led to cancellation of the Noravian contract, including the Buyers' inability to obtain financing or their dissatisfaction with the inspection of the Property. Although the Noravian contract included certain contingencies, none of them are implicated here. For example, the Buyers' performance was conditioned upon their satisfaction with the level of radon gas, the quality of the sewage disposal system, and the well water yield. But the Buyers never terminated the contract. Therefore, we need not decide here whether appellants would have been liable to

the Broker for the fee if the Buyers had canceled the contract pursuant to a contractual contingency.

Appellee maintains that the Agreement is clear and unambiguous and, therefore, its provisions control. Under the terms of the Agreement, appellee asserts that appellants' obligation to pay the commission was triggered when the Holzmans signed the Noravian contract; the right to the commission was not dependent upon consummation of the sale. Moreover, the Broker argues that the Holzmans may not elect to default on the Noravian contract and "then use their breach offensively as a weapon against [appellee's] contractual right."

 Preliminarily, we observe that because the Agreement addressed how commissions are earned, the provisions of Md.Code (1974, 1996 Repl. Vol.), § 14–105 of the Real Property Article ("R.P."), do not apply.[2] *See DeFranceaux Realty Group, Inc. v. Elizabeth Thomas Leeth,* 283 Md. 611, 614, 391 A.2d 1209 (1978); *Berman v. Hall,* 275 Md. 434, 437, 340 A.2d 251 (1975); *Casey v. Jones,* 275 Md. 203, 205, 339 A.2d 33 (1975); *W.C. Pinkard & Co., Inc. v. Castlewood Realty Co., Inc.,* 271 Md. 598, 601, 319 A.2d 123 (1974). Rather, to determine whether the Broker was entitled to a commission in connection with the Noravian contract, we must focus on the terms of the Agreement. *DeFranceaux,* 283 Md. at 614, 391 A.2d 1209 (looking to the contract between the parties to determine "the right of the broker to receive commissions"); *W.C. Pinkard & Co., Inc.,* 271 Md. at 601, 319 A.2d 123 (noting

---

**2.** R.P. § 14–105 states:

In the absence of special agreement to the contrary, if a real estate broker employed to sell, buy, lease, or otherwise negotiate an estate, or a mortgage or loan secured by the property, procures in good faith a purchaser, ... as the case may be, and the person procured is accepted by the employer and enters into a valid, binding, and enforceable written contract, in terms acceptable to the employer, of a sale, purchase, ... and the contract is accepted by the employer and signed by him, the broker is deemed to have earned the customary and agreed commission. He has earned the commission regardless of whether or not the contract entered into is performed, unless performance of the contract is prevented, hindered or delayed by any act of the broker.

that because the parties entered into a brokerage agreement, the terms of the agreement were "controlling"). *See also Loyola Federal Sav. Bank v. Hill,* 114 Md.App. 289, 299, 689 A.2d 1268 (1997); *Anderson–Stokes, Inc. v. Muslimani,* 83 Md.App. 267, 272, 574 A.2d 320, *cert. denied,* 321 Md. 67, 580 A.2d 1077 (1990).

 Maryland law requires that we give legal effect to the unambiguous provisions of a contract. *Calomiris v. Woods,* 353 Md. 425, 432, 727 A.2d 358 (1999). Moreover, "[t]he interpretation of a written contract is ordinarily a question of law for the court." *JBG/Twinbrook Metro Ltd. Partnership v. Wheeler,* 346 Md. 601, 625, 697 A.2d 898 (1997); *see Calomiris,* 353 Md. at 434, 727 A.2d 358; *State Highway Admin. v. David A. Bramble, Inc.,* 351 Md. 226, 239, 717 A.2d 943 (1998); *Suburban Hosp. Inc. v. Dwiggins,* 324 Md. 294, 306, 596 A.2d 1069 (1991); *Nicholson Air Services, Inc. v. Board of County Com'rs of Allegany County,* 120 Md.App. 47, 63, 706 A.2d 124 (1998); *Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. Partnership,* 109 Md.App. 217, 290–91, 674 A.2d 106 (1996), *aff'd,* 346 Md. 122, 695 A.2d 153 (1997);. *Shapiro v. Massengill,* 105 Md.App. 743, 754, 661 A.2d 202, *cert. denied,* 341 Md. 28, 668 A.2d 36 (1995).

 Our primary concern in interpreting a contract is to effectuate the parties' intention. *Nicholson Air,* 120 Md.App. at 63, 706 A.2d 124; *Scarlett Harbor,* 109 Md.App. at 290, 674 A.2d 106; *McIntyre v. Guild, Inc.,* 105 Md.App. 332, 355, 659 A.2d 398 (1995). To ascertain the parties' intention, we look to the language of the contract. *General Motors Acceptance Corp. v. Daniels,* 303 Md. 254, 261, 492 A.2d 1306 (1985); *Nicholson Air,* 120 Md.App. at 63, 706 A.2d 124; *Scarlett Harbor,* 109 Md.App. at 291, 674 A.2d 106; *Faw, Casson & Co. v. Everngam,* 94 Md.App. 129, 134–35, 616 A.2d 426 (1992), *cert. denied,* 330 Md. 155, 622 A.2d 1195 (1992). If the terms of the contract are clear, we presume "the parties intended what they expressed, even if the expression differs from the

parties' intentions at the time they created the contract."
*Nicholson Air,* 120 Md.App. at 63, 706 A.2d 124; *see Roged,
Inc. v. Paglee,* 280 Md. 248, 254, 372 A.2d 1059 (1977); *Scarlett
Harbor,* 109 Md.App. at 291, 674 A.2d 106; *McIntyre,* 105
Md.App. at 355, 659 A.2d 398; *Bernstein v. Kapneck,* 46
Md.App. 231, 244, 417 A.2d 456, *aff'd,* 290 Md. 452, 430 A.2d
602 (1981). Of particular significance here, we may not "re-
write the terms of the contract or draw a new one ... merely
to avoid hardship or because one party has become dissatisfied
with its provisions." *Fultz v. Shaffer,* 111 Md.App. 278, 298,
681 A.2d 568 (1996) (citations omitted); *see Scarlett Harbor,*
109 Md.App. at 253, 674 A.2d 106.

▉▉▉ The trial court determined that the Agreement was
unambiguous, and that it obligated the Holzmans to pay the
fee because they entered into a written agreement to sell the
Property during the term of the Agreement. The "determina-
tion of ambiguity is one of law, not fact, and that determina-
tion is subject to *de novo* review by an appellate court."
*Calomiris,* 353 Md. at 434, 727 A.2d 358. In our view, the trial
court was legally correct. The terms of the Agreement and
the provisions of the Noravian contract refute appellants'
argument that settlement was a condition precedent to the
Broker's contractual right to a commission. *See generally
Chirichella v. Erwin,* 270 Md. 178, 182, 310 A.2d 555 (1973)
(recognizing that the determination of what constitutes a
condition precedent if a question of "construction dependent
on the intent of the parties to be gathered from the words
they have employed").

▉▉▉ Of significance to us, the Noravian contract expressly
provided that appellee's commission was not contingent upon
settlement. Indeed, paragraph 25 stated: "All parties irrevo-
cably instruct the settlement agent to collect a fee or compen-
sation and disburse same according to the terms and condi-
tions provided in the listing agreement.... *Settlement* shall
not be a condition precedent to payment of compensation."
(Emphasis added). To be sure, appellants could have negoti-
ated for a provision in the Agreement that conditioned pay-

ment of the commission upon settlement. But, it is not our function to rewrite the Agreement between parties who had ample ability to bargain for contract terms that would have been more favorable to their respective interests. *Leeth,* 283 Md. at 617, 391 A.2d 1209.

Moreover, the authorities upon which appellants rely to support their position are inapposite. For example, in *De-Franceaux Realty Group, Inc., supra,* 283 Md. 611, 391 A.2d 1209, the contract of sale provided that the brokers would receive their commission "from the proceeds of the sale." *Leeth,* 283 Md. at 613, 391 A.2d 1209. Because the sale never occurred, the sellers sued for specific performance. *Id.* Thereafter, the seller and buyer settled the suit for specific performance. *Id.* Subsequently, the brokers brought an action against the sellers, claiming that they were entitled to their commission because the sellers' suit wrongfully interfered with the brokers' right to a commission. *Id.* The Court noted that, because there was an agreement concerning the brokers' entitlement to a commission, the agreement controlled. *Id.* at 614, 391 A.2d 1209. Under the terms of the agreement, settlement was a condition precedent to the brokers's right to a commission. *Id.* at 617–18, 391 A.2d 1209. As the condition precedent was not satisfied, the Court concluded that "the brokers ... had no contractual right to a commission." *Id.* at 618, 391 A.2d 1209.

Appellants ground their entire argument on one sentence in *Leeth,* which provides: "We have consistently held that when the term 'sale' is used in a contract of this type, it refers to a completed settlement." *Id.* at 617, 391 A.2d 1209 (citations omitted). This pronouncement was derived, in part, from *Wyand v. Patterson Agency, Inc.,* 271 Md. 617, 620, 319 A.2d 308 (1974), in which the Court observed:

Long ago this Court decided that where one employed a real estate broker under an agreement that the broker would be entitled to a commission if there were a "sale" of the property, or if the property were "sold," or if the broker "procured a purchaser," or similar language, *and the agreement did not more specifically set forth when or at what*

*stage in the sale process the right to a commission accrued,* a fully consummated sale had to take place before the broker was entitled to a commission.

(Emphasis added).

In this case, the Agreement did not state that the commission was to be paid from the "proceeds of the sale." Rather, it required payment of the fee if the Sellers executed "a written agreement to sell" the Property.

*Berman v. Hall, supra,* 275 Md. 434, 340 A.2d 251 (1975), is also readily distinguishable from the present case, because the contract of sale at issue there expressly conditioned the broker's right to a commission on settlement. Specifically, the contract provided that the commission was *"due and payable upon the settlement of . . . [the] Contract."* *Berman,* 275 Md. at 435, 340 A.2d 251. Settlement never occurred because, after executing the contract of sale, the sellers and buyers released each other from any obligations arising out of the contract. *Id.* at 435–36, 340 A.2d 251. The broker, who was not a party to the release, then sought to recover his full commission. *Id.* at 436, 340 A.2d 251. Relying on R.P. § 14–105, he claimed that his commission was due upon the execution of the contract of sale. *Id.* at 436–37, 340 A.2d 251. The Court rejected the broker's argument, noting that because the parties' contract addressed the entitlement to a commission, the agreement controlled. *Id.* at 437, 340 A.2d 251. Moreover, the operative language of the contract provided that the broker's right to the commission was contingent upon settlement. *Id.* at 440, 340 A.2d 251. As that condition was not met, the Court concluded that no commission was due. *Id.* at 441, 340 A.2d 251. *See also Chasanow v. Willcox,* 220 Md. 171, 176, 151 A.2d 748 (1959)(stating that when the parties' agreement addresses "the time of payment, source and amount of compensation . . . [due the broker], the statute has no bearing on the decision of . . . [the] case.").

*County Investment Corp. v. Hollander,* 265 Md. 448, 290 A.2d 517 (1972), also is of no help to appellants. In that case, two real estate brokers filed suit to recover their commission

when they located a tenant who entered into a binding lease agreement for a twenty year term. *Id.* at 448–49, 290 A.2d 517. Pursuant to the commission agreement, the brokers were given the option to receive an immediate commission of 3% of the total amount of the lease payments, or 5% of the total amount of the lease, payable in monthly installments. *Id.* at 449, 290 A.2d 517. The brokers opted for the monthly commission payments and regularly received their commission for a period of eleven years. *Id.* at 450–51, 290 A.2d 517. Then, the lessee defaulted and the lessor failed to make the remaining commission payments. As a result, the brokers filed suit. The Court held that they were entitled to recover their commission because all the conditions precedent were satisfied, notwithstanding the lessee's subsequent default. Looking to the language of the commission agreement, the Court reasoned:

> Once ... [the brokers] procured a tenant for ... [the lessor] and a lease was entered into, the total commission was then earned by the brokers. The documents which discuss the commission in no way alter this fact; instead they simply set out the time for effectuating payment. We hold that appellees are entitled to the commission for the remainder of the twenty year lease term.

*Id.* at 453, 290 A.2d 517.

In this case, on August 20, 1996, the Broker presented the Holzmans with the Sterns' revised offer, for a purchase price higher than the Noravians' offer. Nevertheless, on August 25, 1996, the Holzmans executed the Noravian contract. In contrast to *Leeth and Berman,* the liability for the commission was not contingent upon settlement. Thus, when the Holzmans and the Noravians signed the contract of sale on August 25, 1996, appellants became obligated under the Agreement to pay the Broker's fee.

What the Court said in *Borowski v. Meyers,* 195 Md. 226, 72 A.2d 701 (1950), resonates here:

> [W]e hold that where a broker is employed ... the broker is entitled to his commission on performing the service [in

accordance with the parties' agreement] even though there is a voluntary failure of the owner to complete the transaction.... [W]here the broker has fully performed his part of the contract ... he cannot be deprived of his commission by the fact that the sale has failed ... on account of the inability or unwarranted refusal of the principal to consummate the sale according to the prescribed terms.

*Id.* at 231, 72 A.2d 701 (citation omitted).

## II. The Addendum

Appellants contend that, based on the Addendum to the Noravian contract, the Buyers are responsible for the unpaid commission. Therefore, appellants argue that the action against them should have been dismissed, as appellee failed to sue the offending party.

Appellants' argument is premised on their contention that the Addendum constituted a modification to the Agreement. They insist that appellee's knowledge of the Addendum, together with the fact that the provision was intended to benefit the Broker, was sufficient to bind appellee as a third party beneficiary. Moreover, the Holzmans posit that if appellee's claim of entitlement to the commission is based upon the Noravian contract, then appellee must acknowledge the entire contract, including the Addendum. Consequently, they maintain that the Noravians, not appellants, are responsible for the Broker's fee.[3] We disagree.

Ordinarily,

a third party beneficiary contract arises when two parties enter into an agreement with the intent to confer a direct benefit on a third party, allowing the third party to sue on the contract despite the lack of privity.

*Flaherty v. Weinberg*, 303 Md. 116, 125, 492 A.2d 618 (1985). Appellee may well have been a third party beneficiary of the

---

**3.** We need not speculate on the reason for such a provision. It is apparent, however, that if appellants had to pay the Commission, they may have insisted on a higher selling price, which undoubtedly would have increased other costs associated with the sale.

Addendum, because the performance by the Noravians of the promise to pay the commission would have satisfied appellants' obligation to the Broker. *See* Restatement (Second) of Contracts § 302(1) (1979). Nevertheless, under the facts attendant here, appellee was not required to pursue the Buyers for the commission.

Although the Noravian contract provided that the Noravians would pay appellee's fee, the Holzmans promised to pay the Broker's commission under the terms of the Agreement. *See Homa v. Friendly Mobile Manor, Inc.*, 93 Md.App. 337, 353, 612 A.2d 322, *cert. granted,* 329 Md. 168, 617 A.2d 1085 (1992), *cert. denied,* 330 Md. 318, 624 A.2d 490 (1993)(observing that an assignment alone does not relieve the assignor of "his obligations or liabilities under the original contract"); *see also* E. Allan Farnsworth, *Contracts* § 11.10 at 824 (2d ed.1990)(noting that a delegation "does not relieve the delegating party ... of its duty."). Appellants have not provided us with any authority that would relieve them of their contractual duties to the Broker under the Agreement, on the basis of a separate contract with a third party, to which appellee is not a party. Moreover, the clause in the Noravian contract on which appellants rely could not obligate the Buyers to pay the fee when the Sellers defaulted.

For appellants to be discharged from their obligation under the Agreement, the Broker would have had to agree to a modification of the Agreement or enter into a new agreement. In essence, the Addendum and the contract must amount to a novation or modification of the Agreement. *See Contracts* § 11.11 at 834 (noting that for the delegating or assigning party to be relieved of its obligation under the original contract, the creditor or obligee must assent to the delegation/assignment *and* agree to release the delegator/assignor).

 In Maryland, it is well settled that a novation "is a new contractual relation that extinguishes the contract that was previously in existence between the parties." *Mercantile Club, Inc. v. Scherr*, 102 Md.App. 757, 772, 651 A.2d 456 (1995); see also *Dahl v. Brunswick Corp.*, 277 Md. 471, 481,

356 A.2d 221 (1976); *I.W. Berman Properties v. Porter Bros., Inc.,* 276 Md. 1, 7, 344 A.2d 65 (1975); *Kiley,* 102 Md.App. at 327–28, 649 A.2d 1145; *Homa,* 93 Md.App. at 354, 612 A.2d 322. To establish a novation, the party asserting it must prove four necessary requirements: "(1) A previous valid obligation; (2) the agreement of all the parties to the new contract; (3) the validity of such new contract, and (4) the extinguishment of the old contract, by the substitution of a new one." *I.W. Berman Properties,* 276 Md. at 7, 344 A.2d 65(citations omitted); *see also Dahl,* 277 Md. at 481, 356 A.2d 221; *Scherr,* 102 Md.App. at 772, 651 A.2d 456; *Kiley,* 102 Md.App. at 327–28, 649 A.2d 1145; *Homa,* 93 Md.App. at 354, 612 A.2d 322. The Court has recognized that a novation may be established by the facts and circumstances of the situation. It has said:

> The intention to substitute a new agreement for a previous contract need not be expressed[,] however, since facts and circumstances surrounding the transaction, as well as the subsequent conduct by the parties, may show such an acceptance as clearly as an express agreement; but such facts and circumstances, when shown, must be such to establish that the intention to work a novation was clearly implied.

*I.W. Berman Properties,* 276 Md. at 8, 344 A.2d 65 (citations omitted); *see also Dahl,* 277 Md. at 482, 356 A.2d 221.

Here, the trial court clearly found that the Noravian contract and the Addendum did not constitute a novation, because there was no evidence that appellee agreed to anything. That finding was not clearly erroneous. Appellee was not a party to the Noravian contract, and no evidence was adduced to show that appellee agreed to release appellants from their contractual obligation to pay the commission upon entering into a written contract of sale. Moreover, we observe nothing in the Noravian contract indicating that it was intended by appellants and appellee to replace or modify their previous Agreement. That the Broker may have known about the Noravians' agreement to pay the commission is not enough. Therefore, we conclude that the Addendum did not

alter appellants' contractual duties to appellee under the Agreement.

## III. Fiduciary Duty of the Broker and Estoppel

Appellants claim that appellee breached its fiduciary duty to them because, when the Sellers sought to cancel the Noravian contract of sale, the Broker failed to advise them that the Agreement obligated them to pay the commission, even if the sale was not consummated, or that they would expose themselves to liability for more than one commission if they sold the Property to another party. Appellants also contend that, at the time they signed the Agreement, appellee advised them that the commission would be due only upon settlement. Appellants thus assert appellee's conduct constituted an estoppel, precluding the Broker's recovery. We turn first to consider appellants' claim that the Broker had a duty to inform them of their obligations under the Agreement.

A broker "is bound to act in good faith and to make disclosures of matters that are material and might affect the action of his employer in the premises." *Coppage v. Howard,* 127 Md. 512, 523, 96 A. 642 (1916); *see also Sellner v. Moore,* 251 Md. 391, 398, 247 A.2d 523 (1968); *Hardy v. Davis,* 223 Md. 229, 232, 164 A.2d 281 (1960); *Proctor v. Holden,* 75 Md.App. 1, 18, 540 A.2d 133, *cert. denied,* 313 Md. 506, 545 A.2d 1343 (1988). Moreover, if a broker breaches his or her fiduciary duty, acts in bad faith, or in another opprobrious manner, he or she may forfeit the right to compensation. *Sellner,* 251 Md. at 399, 247 A.2d 523 (citations omitted).

It is certainly unfortunate that the Broker did not opt to remind the Holzmans of the terms of the Agreement, with which the Broker undoubtedly had far more familiarity. Nevertheless, under the circumstances of this case, we perceive no breach by appellee of its fiduciary duty to appellants.[4]

---

4. Mr. Blum's description at trial of his "fiduciary relationship" with the Holzmans does not create a fiduciary duty under the law. Nevertheless, given Mr. Blum's testimony as to his "fiduciary relationship" and his desire "to do the best" for the clients, it is somewhat surprising that

The Agreement clearly addressed the terms and conditions under which appellants would owe the Broker a fee, and appellee had no legal duty to remind appellants of the terms of the Agreement that appellants had signed. To the contrary, the Holzmans had a duty to ascertain their obligations under the Agreement.

One is under a duty to learn the contents of a contract before signing it; if, in the absence of fraud, duress, undue influence, and the like he fails to do so, he is presumed to know the contents, signs at his peril, suffers the consequences of his negligence, and is estopped to deny his obligation under the contract.

17 C.J.S. Contracts § 137(b) (1963). *See Binder v. Benson,* 225 Md. 456, 461, 171 A.2d 248 (1961) (noting that "if there's no fraud, duress, or mutual mistake, one who has the capacity to understand a written document who reads and signs it, or without reading it or having it read to him, signs it, is bound by his signature as to all of its terms"); *see also Chandler v. Aero Mayflower Transit Co., Inc.,* 374 F.2d 129, 136 (4th Cir.1967) (recognizing that one generally may not avoid a contract on the "ground that he did not read it or that he took someone else's word as to what it contained"); *Hart v. Vermont Inv. Ltd. Partnership,* 667 A.2d 578, 582 (D.C.1995) (acknowledging that, as a general rule, one who signs a contract has a duty to read it).

Moreover, this is not a case in which the Sellers lacked any experience as to real estate transactions. Rather, the testimony clearly indicated that the Holzmans had experience with listing contracts, as they had previously listed the subject property with another agent. Indeed, Mr. Holzman testified

---

the Broker, in effect, opposed its client's desire to obtain the highest possible purchase price for the Property. Similarly, in pursuing its contract claim against the Sellers, we assume the Broker fully considered the impact such a suit might have on its reputation as an advocate for its customers. Moreover, but for the involvement of a cooperating broker on behalf of the Sterns, who was to share the commission for the Stern contract, we presume that appellee, like appellants, would have preferred the Stern contract, because the purchase price was substantially higher.

that the parties decided to use the "same pattern" for calculating the commission here as appellants had employed previously with another agent.

It is also noteworthy that there is no contention that appellee induced appellants to default on the Noravian contract. To the contrary, the evidence suggests that the Holzmans never endeavored to discuss with the Broker their intention to cancel the Noravian contract. Nonetheless, they knew enough to seek the advice of their counsel.[5]

In our search to find a case on point, we have found the case of *Pfeffer v. General Cas. Co. of America*, 73 S.E.2d 234, 87 Ga.App. 173 (Ga.Ct.App.1952), in which the Court of Appeals of Georgia concluded that a broker had no duty "to point out to . . . [the seller] the specific provisions of the contract for his commissions." *Pfeffer*, 73 S.E.2d at 236. The Court reasoned:

> "The . . . [seller] could read and write, there was no trick, artifice, or fraud practiced upon him which prevented him from reading the contract. The relation between the parties was that of landowner and real estate agent employed for the purpose of negotiating a sale of the land. In respect to the services to be rendered by the real estate agent, a relation of confidence existed between the owner and the agent. In respect to the compensation to be paid to the agent by the owner, the parties dealt at arm's length."

*Id.* at 236 (citation omitted).

■ We are amply satisfied that the evidence shows neither fraud in the procurement of the Agreement, nor deception preventing appellants from reading its provisions. As a consequence, we find no merit to appellants' claims that appellee breached its fiduciary duty.

■ We next consider appellants' estoppel argument. Appellants deny that Mr. Blum read the Agreement aloud to

---

5. We do not know whether the Holzmans' counsel explained to them the risks of defaulting.

them. They also claim that Mr. Blum represented that "the commissions ... were paid upon settlement," and they maintain that they relied on that representation in signing the Agreement. Additionally, they aver that the Agreement is misleading, because it is a one page, single-spaced, fine print standard form document, with no subheadings or bold type to alert the client to particular aspects of the Agreement. Further, the Sellers posit that the terms of the Agreement do not conform to what they understood the Agreement to mean. These contentions are equally unavailing.

> "Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and had been led thereby to change his position for the worse and who on his part acquires some corresponding right, either of property, of contract, or of remedy."

*Knill v. Knill,* 306 Md. 527, 534, 510 A.2d 546 (1986) (citations omitted).

To establish estoppel, three elements must be established: (1) voluntary conduct or a representation by the party to be estopped, even if there is no intent to mislead; (2) reliance by the estopping party; and (3) detriment to the estopping party. *Grimberg v. Marth,* 338 Md. 546, 555–56, 659 A.2d 1287 (1995); *Knill,* 306 Md. at 535, 510 A.2d 546; *Lampton v. LaHood,* 94 Md.App. 461, 475–76, 617 A.2d 1142 (1993). We are satisfied that appellee is not estopped from recovering its commission even if it never read the Agreement aloud to the Holzmans, and even though it presented the revised offer by the Sterns, and continued to list the Property pursuant to appellants' direction after appellants defaulted on the Noravian contract, and failed to remind the Holzmans of the clear terms of the Agreement. Additionally, Mr. Holzman's testimony concerning statements allegedly made by Mr. Blum as to payment of the commission are of no significance.

Mr. Blum's representations were allegedly made before appellants signed the Agreement. As we already noted, appellants had an obligation to read the terms of the Agreement. Indeed, Mr. Holzman testified that appellee instructed him to read the Agreement and that he did, in fact, "briefly read through it." *See Plitt v. McMillan*, 235 Md. 349, 354, 201 A.2d 787 (1964) (concluding that because purchaser examined contract before signing it, she had capacity to understand it, and there was no fraud in its inducement, she was bound by its terms.); *see also Binder*, 225 Md. at 461, 171 A.2d 248; *Rossi v. Douglas*, 203 Md. 190, 199, 100 A.2d 3 (1953). Because the Agreement made it clear that a fee was owed to appellee under the circumstances of this case, the Holzmans may not be heard to complain that they relied on alleged verbal representations of appellee.

Moreover, "as a matter of substantive law, parole [sic] evidence ordinarily is inadmissible to vary, alter or contradict a contract ... that is complete and unambiguous, in the absence of 'fraud, accident, or *mutual* mistake.' " *Bernstein v. Kapneck*, 290 Md. 452, 460, 430 A.2d 602 (1981)(quoting *McLain v. Pernell*, 255 Md. 569, 572, 258 A.2d 416 (1969)); *see also Canatella v. Davis*, 264 Md. 190, 200, 286 A.2d 122 (1972); *Donovan v. Kirchner*, 100 Md.App. 409, 419, 641 A.2d 961, *cert. denied*, 336 Md. 299, 648 A.2d 202 (1994). As appellants are not challenging the Agreement on grounds of fraud, accident, or mutual mistake, Mr. Holzman's testimony that appellee represented that the commission was due only upon settlement contravened the parol evidence rule.

## IV. The $21,500 Credit

The trial court determined that, under the terms of the Agreement, appellee earned a commission when appellants executed the Noravian contract. Later, the court reduced the commission by $21,500. The amount of the reduction was equal to the fee recovered by appellee as the commission for the Stern contract. In its cross-appeal, the Broker challenges the trial court's decision to reduce the judgment by the amount of the commission it subsequently earned. Appellee

argues that the Stern contract was a separate contract of sale executed in October 1996, well within six months of the expiration of the Agreement in September 1996. Therefore, it contends that, under the Agreement, it was entitled to commissions for both the Noravian contract and the Stern contract.

Appellants counter that if one adopts appellee's construction of the Agreement, then the Broker could earn an unlimited number of commissions on a single piece of property, so long as none of those contracts proceed to settlement. Appellants argue that such a construction "stretches the bounds of reasonableness and requires judicial intervention." In essence, appellants assert that the court was correct to grant the credit, because the Agreement is otherwise unconscionable, and enforcing it would lead to an inequitable result.

In its brief, the Broker suggests that appellants were "greedy" when they defaulted on the Noravian contract in order to proceed with the more lucrative offer from the Sterns. Appellee argues that appellants may not avoid the consequences of their conduct by contending that they are not responsible for both commissions. Appellants respond by condemning the Broker's greediness. To be sure, the Broker is attempting to "double dip." As we see it, the adage of the "pot calling the kettle black" is appropriate here. We also ask, rhetorically, whether appellee would have complained had appellants proceeded with the Sterns' offer if there had been no cooperating broker; absent the participation of another broker, appellee would have recovered a greater commission based on the purchase price for the Stern contract than from the Noravian contract.

Neither party has provided us with any legal authority that directly supports their respective positions. In our research, we have found the case of *Stover & Sons, Inc. v. Harry Norman, Inc.*, 370 S.E.2d 776, 187 Ga.App. 514 (Ga.Ct.App. 1988), which is instructive. There, a real estate broker sought to recover his commission from a purchaser who failed to buy the property after executing a contract of sale. The contract

of sale provided that if the purchaser defaulted it would pay the broker his full commission. *Stover*, 370 S.E.2d at 777. The purchaser urged that, in order to avoid a double recovery by the broker, the amount he owed the broker should be reduced by the amount of the commission the broker received from the subsequent sale of the property to a different purchaser. *Id.* The Court of Appeals of Georgia rejected the purchaser's argument. It reasoned:

> [The broker's] recovery is for the services it performed in connection with negotiating the contract. These services and the resulting contract are separate and apart from whatever services were rendered by [the broker] ... in connection with the subsequent sale of the real property. The subsequent sale of the real property to a different buyer was a separate transaction. Under these facts and circumstances there is no double recovery.

*Id.* (citation omitted). We are not persuaded that *Stover & Sons, Inc.* applies here.

Preliminarily, we observe that there was no evidence offered by the Broker as to any meaningful additional services it rendered in regard to the Stern contract. Indeed, at trial, Mr. Blum testified that the Stern contract was not processed through his office. Moreover, no evidence was adduced that the Sellers sought to bypass the Broker or wait until the Agreement expired before selling the Property.

Significantly, the Agreement does not address the circumstances presented here; it does not specifically provide that the Broker may recover more than one commission for the sale of the Property in the event of a default by the Sellers. Applying the principles of contract construction that we reviewed earlier, if the parties intended the Broker to procure a double recovery under the circumstances of this case, the contract should have so specified. Instead, the language of the commission clause suggests to us that the parties contemplated one fee from the Sellers with respect to the sale of the Property. *See Heat & Power Corp. v. Air Products and Chemicals, Inc.*, 320 Md. 584, 596, 578 A.2d 1202 (1990)(noting

that, when construing a contract, the court must consider the character and purpose of the contract and the facts and circumstances of the parties at the time the agreement is executed).

In the commission clause of the Agreement, the enumerated events that trigger the Broker's entitlement to a fee are listed in the alternative; the Broker is entitled to a commission based on one of three circumstances. As we noted, the Agreement specifically provided, *inter alia*, that the Holzmans would pay the Broker a commission if: (1) during the term of the Agreement, the Broker produced a buyer "to purchase the Property at the listing price ... or at such other price or on such other terms as accepted by" appellants; **or** (2) during the term of the Agreement, appellants entered "into a written agreement to sell, exchange, convey or transfer the Property to any person or entity;" **or** (3) within six months after the expiration of the Agreement, appellants entered into a "written agreement to sell, exchange, convey or transfer the Property to any person who ... inspected or made inquiry about the Property or negotiated to purchase ... the Property" while the Agreement was in effect. (Emphasis added). *See Enterprise Leasing Co. v. Allstate Insurance Co.,* 341 Md. 541, 548, 671 A.2d 509 (1996)(recognizing that the use of the disjunctive "or" in the statute indicates that the permission of either the owner or the lessee is sufficient to bring the operator of a leased vehicle under the coverage of the required security); *Hosain v. Malik,* 108 Md.App. 284, 333, 671 A.2d 988 (1996)(noting that the "or" in Md. Rule 8–131(a) is disjunctive, directing that an issue is preserved for appellate review "if it was either raised by a party or decided by the court"); *see also Parrish v. District of Columbia,* 718 A.2d 133, 135 (D.C.1998)(stating: "The word 'or' ... is normally disjunctive and establishes a relationship of contrast"); *Charles E. Smith, Inc. v. District of Columbia Rental Housing Com'n,* 492 A.2d 875, 878 (D.C.1985)(reasoning that "The use of the disjunctive 'or' to join alternatives, indicates that they are mutually exclusive").

We are satisfied that, based on the facts of this case, the court was entitled to conclude that the commission clause did not contemplate a double recovery by the Broker. *Syme v. Marks Rentals, Inc.,* 70 Md.App. 235, 243–44, 520 A.2d 1110 (1987), is instructive. There, we noted that, in ascertaining the unconscionability of a contractual provision, a court should consider several factors, including:

(1) the standardized agreement executed by the parties of unequal bargaining strength; (2) lack of opportunity to read or become familiar with [the] document before signing it; (3) evidence that the contractual provision was commercially unreasonable or its interpretation would not be anticipated by the ordinary customer; (4) substantive unfairness of the terms of the contract; (5) impact of the relationship of the parties of assent, unfair surprise and notice; and (6) all the circumstances surrounding the formation of the contract including its commercial setting, purpose, and effect. *See Davis v. M.L.G. Corporation,* 712 P.2d 985, 991 (Colo.1986); RESTATEMENT (SECOND) OF CONTRACTS § 208 (1979); 17 AM.JUR.2D *Contracts* § 193 (1964).

 Because appellee based its claim for a commission on the basis of appellants' execution of the Noravian contract, pursuant to subparagraph (1) of the commission clause, the Agreement did not entitle the Broker also to recover based on the Stern contract, for which the Broker relied on subparagraph (3) of the commission clause. Accordingly, we are satisfied that the trial court properly reduced the judgment by the amount of the commission appellee received from the subsequent sale of the Property to the Sterns.

## V. Attorney's Fees

Appellants challenge the court's decision to award appellee attorney's fees in the amount of $12,408. That sum represented the amount of appellee's liability to its attorney, pursuant to appellee's agreement with its attorney for a one-third contingency fee. Appellants observe that, notwithstanding appellee's fee agreement with its attorney, the Agreement between the Holzmans and Blum merely provides for payment

of a reasonable attorney's fees to the Broker; it does not set forth a specific percentage. The Holzmans also argue that the court erred because appellee did not present evidence concerning the reasonableness of the one-third contingency fee, the extent of the attorney's work, the experience of counsel, or the customary fee for such representation.

In essence, the issue here is whether the one-third contingency fee agreement between the Broker and its attorney is binding upon appellants. Although the Holzmans agreed to pay appellee a reasonable attorney's fee if appellee successfully brought an action to recover its commission, they did not agree to pay whatever legal fee appellee might agree to pay its attorney.

 Ordinarily, a prevailing party is not entitled to recover attorney's fees. *Hess Constr. Co. v. Board of Educ.*, 341 Md. 155, 159, 669 A.2d 1352 (1996); *Empire Realty Co. v. Fleisher*, 269 Md. 278, 285, 305 A.2d 144 (1973); *Bresnahan v. Bresnahan*, 115 Md.App. 226, 244, 693 A.2d 1, *cert. denied*, 346 Md. 629, 697 A.2d 913 (1997). A trial court generally may award attorney's fees only when statutorily authorized or when, as here, a contract between the parties specifically authorizes such fees. *Maxima Corp. v. 6933 Arlington Dev. Ltd. Partnership*, 100 Md.App. 441, 452, 641 A.2d 977 (1994); *see Hess*, 341 Md. at 160, 669 A.2d 1352; *Bresnahan*, 115 Md.App. at 244, 693 A.2d 1; *Reisterstown Plaza Associates v. General Nutrition Ctr., Inc.*, 89 Md.App. 232, 241–42, 597 A.2d 1049 (1991). When attorney's fees are permitted, the award is " 'a factual matter which lies within the "sound discretion of the trial judge and will not be overturned unless clearly erroneous." ' " *Reisterstown Plaza*, 89 Md.App. at 248, 597 A.2d 1049 (quoting *Dent v. Simmons*, 61 Md.App. 122, 127, 485 A.2d 270 (1985), in turn quoting *Foster v. Foster*, 33 Md.App. 73, 81, 364 A.2d 65 (1976)).

 When an award of attorney's fees is based on a contractual right, the losing party is " 'entitled to have the amount of fees and ordinary expenses proven with certainty and under the standards ordinarily applicable for proof of

contract damages.' " *Maxima Corp.,* 100 Md.App. at 453, 641 A.2d 977 (quoting *Bankers and Shippers Ins. Co. v. Electro Enter., Inc.,* 287 Md. 641, 661, 415 A.2d 278 (1980)). Indeed, as we said in *Commercial Union Ins. Co. v. Porter Hayden Co.,* 116 Md.App. 605, 703, 698 A.2d 1167, *cert. denied,* 348 Md. 205, 703 A.2d 147 (1997): "[W]hen claims for attorneys' fees and expenses are ... claimed as damages for breach of contract, the plaintiff must satisfy the standards spelled out" in *Bankers* and *Maxima* Corp. The Court in *Bankers* explained:

> It is equally clear from the record, however, that the informal hearing conducted by the trial court neither required any real proof of the amount of the fees and expenses claimed nor provided Bankers with a realistic opportunity to challenge those fees and expenses. This was a case involving claims for attorneys' fees and expenses as damages for a breach of contract, and not one of the relatively unusual types of cases where the trial court is authorized to award the prevailing party in litigation before the court his reasonable attorneys' fees. Consequently, Bankers was entitled to have the amount of fees and expenses proven with certainty and under the standards ordinarily applicable for proof of contractual damages. Instead, the parties merely submitted, prior to the hearing, informal fee and expense petitions and made short, oral representations at the hearing of the amounts claimed. On remand there should be a proper trial regarding the damages incurred. . . .

*Bankers,* 287 Md. at 661–62, 415 A.2d 278.

Similarly, in *Maxima Corp.,* 100 Md.App. at 452, 641 A.2d 977, we made clear that the moving party must prove its claim for attorney's fees with competent evidence. We said that (a) the party seeking the fees, whether for him/herself or on behalf of a client, always bears the burden of presenting evidence sufficient for a trial court to render a judgment as to their reasonableness; (b) an appropriate fee is always reasonable charges for the services rendered; (c) a fee is not justified by a mere compilation of hours multiplied by

fixed hourly rates or bills issued to the client; (d) *a request for fees must specify the services performed, by whom they were performed, the time expended thereon, and the hourly rates charged;* (e) it is incumbent upon the party seeking recovery to present detailed records that contain the relevant facts and computations undergirding the computation of charges; (f) without such records, the reasonableness, *vel non,* of the fees can be determined only by conjecture or opinion of the attorney seeking the fees and would therefore not be supported by competent evidence.

*Maxima Corp.,* 100 Md.App. at 453–43, 641 A.2d 977 (emphasis in original) (citing *Kaiser v. MEPC American Properties, Inc.,* 164 Ill.App.3d 978, 115 Ill.Dec. 899, 518 N.E.2d 424, 427–28 (1987)).

 It is clear that, following the presentation of evidence in support of a claim for attorney's fees, " 'the trial court must still evaluate the reasonableness of the fees.' " *Kilsheimer v. Dewberry & Davis, et al.,* 106 Md.App. 600, 621, 665 A.2d 723 (1995), *cert. denied,* 341 Md. 406, 671 A.2d 20 (1996)(quoting *Maxima Corp.,* 100 Md.App. at 454, 641 A.2d 977). Moreover, "the trial court's evaluation of a claim for attorneys' fees must be based on a record that includes information that sufficiently and competently supports the court's findings." *Maxima Corp.,* 100 Md.App. at 458, 641 A.2d 977. In this regard, a court shall consider:

" '(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

'(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

'(3) the fee customarily charged in the locality for similar legal services;

'(4) the amount involved and the results obtained;

'(5) the time limitations imposed by the client or by the circumstances;

'(6) the nature and length of the professional relationship with the client;

'(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

'(8) whether the fee is fixed or contingent.' "

*Reisterstown Plaza,* 89 Md.App. at 246–47, 597 A.2d 1049(quoting Rule of Professional Conduct 1.5(a)); *see Attorney Grievance Comm'n v. Korotki,* 318 Md. 646, 569 A.2d 1224 (1990); *Maxima Corp.,* 100 Md.App. at 454–55, 641 A.2d 977.

That appellee entered into a one-third contingency fee agreement with its attorney did not relieve appellee from having to present evidence addressing the criteria set forth in the cases cited above. Yet, almost no evidence was adduced by appellee pertaining to these factors.

At trial, appellee presented the following testimony concerning counsel fees:

[Appellee's counsel]: And as a result of not being paid a commission have you hired Mehlman & Greenblatt?

[Mr. Blum]: Yes, I have.

[Appellee's counsel]: And under what terms, if you—

[Mr. Blum]: On the contingency basis.

[Appellee's counsel]: And do you know what the contingency was?

[Mr. Blum]: 33 and 1/3%.

[Appellee's counsel]: To date based upon your personal knowledge of what, if any, efforts has Mehlman & Greenblatt put into the prosecution of your case?

[Mr. Blum]: Met with, actually with Mr. Mehlman first. Put together the whole package of materials, which he has reviewed, probably, I take for granted with you. We met for the depositions. We prepared for trial. And we are here today.

[Appellee's counsel]: Were any motions filed in the case that you are aware of?

[Mr. Blum]: Yes, there were.

[Appellee's counsel]: And does listing the contract that was executed between Fiola Blum and the Holzmans call for reasonable attorney's fees if you are successful in pursuit of that commission?

[Mr. Blum]: Yes, it does.

*Arthur Andersen & Co. v. Perry Equipment Corporation,* 945 S.W.2d 812, 40 Tex. Sup.Ct. J. 591 (Tex.1997), is instructive. There, a corporation successfully sued its accounting firm under the Texas Deceptive Trade Practices Act ("the statute"), for a faulty audit the firm had prepared of an acquired corporation. The statute provided for recovery of " 'reasonable and necessary attorneys' fees.' " *Arthur Andersen,* 945 S.W.2d at 818 (citation omitted). After enumerating the same eight factors we must consider when determining the reasonableness of a fee, the Texas Supreme Court stated: "A party's contingent fee agreement should be considered by the factfinder ... but that agreement cannot alone support an award of attorney's fees under [the statute]...." *Id.* The Court reasoned:

> While we do not doubt that many plaintiffs must contract for a contingent fee to secure the services of a lawyer, we do not believe that the [statute] ... authorizes the shifting of the plaintiff's entire contingent fee to the defendant without consideration of the factors required by the Rules of Professional Conduct. A contingent fee may indeed be a reasonable fee from the standpoint of the parties to the [fee] contract. But, we cannot agree that the mere fact that a party and a lawyer have agreed to a contingent fee means that the fee arrangement is in and of itself reasonable for purposes of shifting that fee to the defendant.

*Id.*

 Here, the court stated: "One-third of $37,600. That clearly is the price that [appellee] is going to have to pay the attorney. Is that amount $12,408 unreasonable? I can't say that it's unreasonable. Can't say." Appellants' counsel interjected: "No testimony that it is reasonable." The court responded: "No testimony that it isn't unreasonable." We

note, however, that the burden was not on appellants to show that a one-third contingency fee was unreasonable. Rather, appellee had the burden to demonstrate that the fee was reasonable.

On the record before the court, it concluded that the one-third contingency fee was "a reasonable arrangement to make with an attorney." Although appellee and its attorney contracted for a one-third contingency fee, such an agreement is not *per se* reasonable or binding upon appellants for the services rendered. The amount of the fee awarded by the court may well be appropriate. But, based on what was presented to the trial court, we are of the view that the evidence did not support the award. Accordingly, we shall remand the matter to the circuit court for further proceedings regarding the appropriate legal fee award.

**JUDGMENT AFFIRMED EXCEPT AS TO ATTORNEY'S FEES; AWARD OF ATTORNEY'S FEES VACATED; CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID 60% BY APPELLANTS AND 40% BY APPELLEE.**