859 A.2d 239

**GREENBRIAR CONDOMINIUM, PHASE I, COUNCIL OF UNIT OWNERS, INC.**

v.

**Clifford A. BROOKS.**

**No. 1884, Sept. Term, 2002.**

Court of Special Appeals of Maryland.

Sept. 2, 2004.

Reconsideration Denied Nov. 8, 2004.

276

280

Frank J. Emig, Greenbelt, for Appellant.

Clifford A. Brooks, Greenbbelt, for Appellee.

Panel: KENNEY, DEBORAH S. EYLER, and SHARER, JJ.

KENNEY, Judge.

In this case, we are asked to consider issues of concern to both the growing number of people who live in common interest communities and to the governing authorities responsible for their operation. The fact that the parties are not strangers to this Court is unfortunate, but not surprising, as these cases often reflect an ongoing test of wills among the parties involved.

Involved are several entities and documents with similar names. Therefore, we begin by identifying the various entities and their governing documents. Greenbriar, a residential development located in Prince George's County, was developed in four phases. The overall community association, "GCA," has two governing documents that are pertinent to this appeal: the "GCA Declaration" and the "GCA By–Laws." [1] GCA is not a party in the case. Clifford A. Brooks, appellee, owns a condominium unit in Greenbriar Phase I. The appellant is Greenbriar Condominium, Phase I, Council of

---

1. The GCA was first known as the Greenbriar Recreational Association. The Declaration was originally titled "Declaration of Covenants, Conditions and Restrictions for Greenbriar Recreational Association, Inc." and the By–Laws were originally titled "By–Laws of Greenbriar Recreational Association, Inc." Throughout the opinion, we shall refer to this association as "GCA" and its governing documents as the "GCA Declaration" and the "GCA By Laws."

Unit Owners, Inc., which we shall refer to as "Council."[2] Council has its own governing documents that are pertinent to this appeal, which we will refer to as the "Council Declaration" and "Council By–Laws."

Council appeals an order from the Circuit Court for Prince George's County that, *inter alia,* invalidated the January 15, 1999 foreclosure of Brooks's condominium and granted Brooks reasonable attorneys' fees for his involvement in the foreclosure proceedings after December 17, 1997. Council presents two questions for our review:

1. Did the circuit court err in setting aside the January 15, 1999 foreclosure sale of Brooks's property?

2. Did the circuit court err in determining that Brooks was entitled to an award of attorneys' fees?

Brooks filed a cross-appeal, presenting three questions, which we have slightly re-worded as follows:

1. Did the circuit court err in its assessment of the amount due for 1995 and 1996 liens by failing to take into account all payments made by Brooks?

2. Did the circuit court err in finding that Brooks was not entitled to attorneys' fees for records and amounts excluded by the court?

3. Did the circuit court err in not granting reasonable attorneys' fees to Brooks under Maryland Rule 2–424(e)?

Brooks also moved to dismiss the case, claiming that the Council's Notice of Appeal was not timely filed.

We hold that the circuit court did not err in setting aside the January 15, 1999 foreclosure sale, but for reasons set forth in the opinion, we shall remand for further proceedings. In addition, we find error in the circuit court's award of interest

---

2. In prior proceedings, "Council" was referenced as "Greenbriar." Because the relationship between Greenbriar Condominium, Phase I, Council of Unit Owners, Inc. and the greater community, GCA, in collection of certain assessments, is a matter of concern in this case, we believe that referring to Council as Greenbriar is potentially confusing. For that reason, in this opinion we will refer to Greenbriar Condominium, Phase I, Council of Unit Owners, Inc. as "Council."

and attorneys' fees. As to the issues presented in Brooks's cross-appeal, we shall affirm the judgments of the circuit court.

## FACTUAL AND PROCEDURAL HISTORY

This case began in 1994 when Council sought to foreclose on Brooks's condominium unit because Brooks had failed to pay his monthly condominium charges. That foreclosure and one subsequent were cancelled when Brooks paid Council the amount due before the respective foreclosure sales.

In February 1996, Council again initiated foreclosure proceedings when Brooks failed to pay his assessment for October, November, and December 1995. A statement of indebtedness for $3,745 was filed with the circuit court. Frank Emig, Council's current counsel, was appointed trustee for the sale of the condominium. On May 10, 1996, the condominium was sold to Council for $2,500, subject to a first deed of trust in the amount of $16,698.26. On July 3, 1996, Brooks filed exceptions to the foreclosure sale. After a hearing, the circuit court entered an order ratifying the sale. Brooks noted a timely appeal.

In an unpublished opinion, *Clifford A. Brooks v. Greenbriar Condominium, Phase I Council of Unit Owners, Inc.*, No. 87, September Term, 1997, 118 Md.App. 711 (filed Dec 17, 1997), this Court vacated the order ratifying the sale and remanded to the circuit court for it to "determine whether [the sale price] 'shocks the conscience of the court.' " *Clifford A. Brooks v. Greenbriar Condominium, Phase I Council of Unit Owners, Inc.*, No. 87, slip op. at 12. On remand, the circuit court, on December 8, 1999, found that its conscience was indeed "shocked." Council was then free to readvertise and resell the condominium unit, which it proceeded to do. The events leading up to the present appeal begin at that point in time.[3]

---

3. This Court also heard a second consolidated appeal between Council and Brooks that arose out of a suit filed by the Council for unpaid assessments for the period January 1, 1997, to May 31, 2001, and issued an unreported opinion, *Brooks v. Greenbriar Condominium Phase*

On December 14, 1998, Brooks filed with the court a Suggestion of Satisfaction of Outstanding Liens, stating that he had "personally delivered by hand to [Emig] a cashier's check in the amount of $3,411.00 in full satisfaction" of the underlying liens. On December 22, 1998, Council filed a response indicating that $3,411 was insufficient to satisfy the lien, and returned the check to Brooks. In response, Brooks sent a letter to Council, in care of Emig, asking for the exact amount owed. One week later, on December 29, 2002, Brooks reviewed the audit and calculated that he owed an additional $162.89. Brooks went to the bank and got a bank check in that amount to send to Council. On that same day, Council filed a supplemental statement of indebtedness, indicating that Brooks now owed $31,114.64 to satisfy the lien.[4] In light of Council's supplemental statement, Brooks deemed it "fruitless" to send the additional $162.89 check.

At the foreclosure sale on January 15, 1999, Council again purchased the condominium unit. The purchase price was for $21,600, subject to the existing deed of trust on which $13,092.77 was owed. After the sale was conducted, but that same morning, Brooks filed an emergency motion for a temporary restraining order and for preliminary injunction; four days later, he filed an emergency motion for appropriate relief. Council filed oppositions to Brooks's motions. On January 19, 1999, Brooks deposited $3,411 in the court's registry. On March 5, 1999, Council filed its suggested final deficiency accounting for $11,445.62. On March 25, 1999, the circuit court filed a notice that the foreclosure would be ratified and confirmed on April 26, 1999. Brooks filed timely exceptions.

The Auditor's Report, filed on May 14, 1999, indicated that $8,660.46 was due; both Council and Brooks filed exceptions. On May 27, 1999, the circuit court, after a hearing on the

---

I, *Council of Unit[ ] Owners and Condominium Venture Inc.*, Nos. 1858 and 2464, September Term, 2001 (filed November 24, 2003).

4. The $31,114.64 included the underlying debt, late fees, accrued interest, and attorneys' fees.

exceptions, invalidated the sale. It found that Brooks had lawfully attempted to redeem the property when it tendered $3,411 to Council. The court also heard argument on whether Brooks owed any additional amounts and what should be the appropriate interest rate on the liens. Council argued that interest accrued at 18% based on the Maryland Condominium Act as stated in Council's Bylaws. Brooks countered that only 6% interest was due based on the GCA Declaration. The court agreed with Brooks, saying, "You give him the $3,411, plus the six percent as of May 10, 1996, and I'll dismiss the foreclosure." Because Brooks had already deposited $3,411 with the court's registry, only the interest was outstanding.

On June 4, 1999, Brooks filed a Motion for Attorneys' Fees and Costs based on the GCA Declaration that provided that the "prevailing party shall be entitled to recover the costs of the proceedings, and such reasonable attorneys' fees as may be determined by the court." On June 17, 1999, Council filed an opposition to Brooks's motion for attorneys' fees. On that same day, Council filed another set of exceptions to the Auditor's Report of May 14, 1999, and a Motion to Reconsider the circuit court's ruling of May 27, 1999.

On July 6, 1999, the circuit court held a hearing concerning Council's motion to reconsider and Brooks's motion for attorneys' fees. Council argued that the May 27, 1999 ruling that only 6% interest was due on the outstanding lien amount was erroneous. It contended that Brooks's reliance on the GCA Declaration was misplaced because GCA did not institute suit against Brooks. Rather, the lien was established and foreclosed upon by Greenbriar Condominium Phase I, Council of Unit Owners, Inc., and, therefore, Council's, not GCA's, governing documents applied. Council's By–Laws state the "maximum amount permitted by law ... as permitted by Section 11–110(e) of the [Maryland Condominium] Act," which provides for an interest rate of 18%. The court denied the motion to reconsider.

In support of his motion for attorneys' fees, Brooks argued that the GCA Declaration is the only one his deed is subject

to, and its provision for the recovery of attorneys' fees should be applicable. "[Council] has a declaration for a plan of condominiums, but there is only one declaration of covenants, and that is the [GCA] declaration." Council responded that it, not the GCA, was the party to the suit.

In reaching its decision, the circuit court found it important that every phase in Greenbriar pays fees to the GCA, and that, in fact, a portion of the amount for which Council was suing was for the benefit of GCA. "So [the GCA is] part and parcel of this suit, whether [it is] named or not. The funds are for the benefit of this." Thus, the court concluded that Council's effort to distinguish itself from the overall community association entity, was without merit:

> I think this is a distinction without a difference, sir. Because you can't tell me any time when that other organization has ever filed a lien or brought a suit, and if it says that it grants attorney fees when the other side prevails, and the other side prevails in a suit brought about by the parent organization, which collects for that organization, for those funds, and then you are going to tell me that the other side, for that portion of the funds, can't elect to have attorney fees granted, somehow or other, that doesn't make sense.

Finally, in this hearing, the court denied Brooks's motion to award fees related to Council's failure to admit in discovery the value of the condominium property. The court then asked the parties to prepare a joint order setting forth its oral rulings.

On July 7, 1999, the circuit court ordered the clerk to release $3,411 from the court registry to Council. Council subsequently filed a motion for a *supersedeas* bond and to stay further proceedings. Brooks filed a motion in opposition thereto.

On January 2, 2000, Brooks filed a motion for attorneys' fees in the amount of $311,305.64. Council filed a response on January 19, 2000, claiming the motion was premature until the

court signed a final order affirming its July 6, 1999 oral decisions.

On September 23, 2002, the circuit court filed an order that stated:

For the reasons stated by the Court at the July 6, 1999 hearing in this matter, it is, on this 23 day of September, 2002, by the Circuit Court for Prince George's County, Maryland,

ORDERED, that [Council's] Complaint in these proceedings is hereby dismissed and the foreclosure sale of January 15, 1999, invalidated; and it is further,

ORDERED, that [Council's] Motion to Reconsider Ruling of May 27, 1999, is hereby denied; and it is further,

ORDERED, that [Brooks's] Motion, pursuant to Md. Rule 2–424(e), to recover expenses, including reasonable attorney fees incurred in making proof of matter which [Council] failed to admit (Docket # 98) is hereby denied; and it is further,

ORDERED, that [Council] shall pay to [Brooks] reasonable attorney's fees for his prior appeal to the Court of Special Appeals in these proceedings, such amount to be determined following a hearing on this issue; and it is further,

ORDERED, that [Brooks] shall establish his reasonable attorney fees for his involvement in these proceedings after December 17, 1997. The parties shall also establish the percent of the budget of [Council] that is paid to [GCA] for its assessments. [Council] shall be responsible for and pay to [Brooks] this percentage of [Brooks's] attorney's fees for his involvement in these proceedings after December 17, 1997. The determination of these figures shall be made by the Court following a hearing on this issue; and it is further,

ORDERED, that the issue of the amount of attorneys' fees shall be deferred until the completion of any appeal of this Order; and it is further,

ORDERED, that the amount of the *supersedeas* bond is hereby set at $1,000.00. [Council] shall be given seven (7) days to post such bond and the effect of this Order shall be stayed during this seven (7) day period, and if such bond is timely posted, the stay shall continue in effect thereafter until the appeal is completed.

On September 30, 2002, Council's motion to post a cash bond in lieu of a *supersedeas* bond was granted. On October 16, 2002, Council filed this appeal, and on October 25, 2002, Brooks noted his cross-appeal.

## PRELIMINARY MOTIONS

### *I. Motion to Dismiss*

■ Brooks contends that this appeal should be dismissed because Council did not note a timely appeal. According to Brooks, "[f]inal appealable Orders sustaining Brooks' exceptions which prayed that [Council's] sale and resale of Brooks' Condominium Unit be set aside were rendered from the Bench on December 8, 1998 and May 27, 1999, respectively." Accordingly, he argues that Council's appeal dated October 16, 2002, was untimely.

A party may only appeal from a final judgment. Md.Code (1974, 2002 Repl.) § 12–301 of the Courts and Judicial Proceedings Article ("C.J."). As explained by the Court of Appeals in *Rohrbeck v. Rohrbeck*, 318 Md. 28, 41, 566 A.2d 767 (1989):

If a ruling of the court is to constitute a final judgment, it must have at least three attributes: (1) it must be intended by the court as an unqualified, final disposition of the matter in controversy, (2) unless the court properly acts pursuant to Md. Rule 2–602(b), it must adjudicate or complete the adjudication of all claims against all parties, and (3) the clerk must make a proper record of it in accordance with Md. Rule 2–601.

In *Doehring v. Wagner*, 311 Md. 272, 275, 533 A.2d 1300 (1987), the Court of Appeals stated that a judgment is only

final if "nothing in the trial court's action suggested any contemplation that a further order be issued or that anything more be done." For example, in *Anderson v. Anderson,* 349 Md. 294, 297–98, 708 A.2d 296 (1998), the Court dismissed an appeal as untimely because the trial court appeared to be waiting for a domestic master to complete a child support worksheet before the ruling would be final.

Similarly, the circuit court in this case asked the parties for a joint order.

Give me an order on my rulings today. It has to be a joint order, and Mr. Emig, you give me the order for the money in the registry of the court.

Okay. Orders to be submitted.

\* \* \*

Let me make myself clear on that. I have ruled today on several things. Give me an order that both of you agree to as what I just ruled on.

The order was signed on September 23, 2002, and entered into the docket on September 26, 2002. Council's appeal dated October 16, 2002, was timely, and Brooks's motion to dismiss is denied.

## II. Motion to Supplement Record

At oral argument, we asked the parties to provide us with copies of the various governing documents. On October 20, 2003, Council provided us with: GCA's Articles of Incorporation; GCA's Declaration of Covenants, Conditions and Restrictions; GCA's Supplemental Declaration of Covenants, Conditions and Restrictions; GCA's Amended By–Laws; Council's Articles of Incorporation; Council's Declaration; and Council's Amendment to By–Laws.

■ Thereafter, on April 2, 2004, Brooks petitioned this Court to have Council's original By–Laws included as part of the record in this case. Although we requested Council's and GCA's governing documents, those documents did not automatically become part of the record. *See* Maryland Rule 8–414 (stating that the appellate court may order that an omis-

sion in the record be corrected). Because the submissions were useful to the resolution of this case, and perhaps will be helpful to the circuit court on remand, we order that Council's October 20, 2003 submission be included in the record and grant Brooks's motion to include his April 2, 2004 submission as part of the record for this case.

## STANDARD OF REVIEW

Maryland Rule 8–131(c) provides:

**Action tried without a jury.** When an action has been tried without a jury, the appellate court will review the case on both the law and the evidence. It will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and will give due regard to the opportunity of the trial court to judge the credibility of the witnesses.

In regard to the circuit court's factual findings, we look to whether those findings were supported by "substantial evidence" in the record. *Liberty Mut. Ins. Co. v. Maryland Auto. Ins. Fund,* 154 Md.App. 604, 609, 841 A.2d 46 (2004). When " 'there is any competent, material evidence to support the factual findings below, we cannot hold those findings to be clearly erroneous.' " *Cannon v. Cannon,* 156 Md.App. 387, 404, 846 A.2d 1127 (2004) (citing *Shallow Run Ltd. Partnership v. State Highway Admin.,* 113 Md.App. 156, 174, 686 A.2d 1113 (1996)).

"Although the factual determinations of the circuit court are afforded significant deference on review, its legal determinations are not." *Liberty Mut. Ins. Co.,* 154 Md.App. at 609, 841 A.2d 46. "Indeed, the appropriate inquiry for such determinations is whether the circuit court was 'legally correct.' " *Id.* (citing *Maryland Envtl. Trust v. Gaynor,* 140 Md.App. 433, 440, 780 A.2d 1193 (2001)).

Furthermore, trial courts are accorded broad discretion in granting equitable relief. *State Comm'n on Human Rels. v. Talbot County Det. Ctr.,* 370 Md. 115, 127, 803 A.2d 527 (2002). Maryland has recognized that "[f]oreclosure of mortgages after default has long been peculiarly within a court of equity's

jurisdictional powers." [5] *Plaza Corp. v. Alban Tractor Co.,* 219 Md. 570, 577–78, 151 A.2d 170 (1959). The applicable Maryland Rules and statutory authority "simply provide[ ] an expeditious and economical summary modal procedure for the exercise of an ordinary jurisdiction." *Id. See also Laney v. State,* 379 Md. 522, 842 A.2d 773 (2004); *Billingsley v. Lawson,* 43 Md.App. 713, 406 A.2d 946 (1979) (for a general discussion on foreclosure proceedings in Maryland).

## DISCUSSION

### I. *January 15, 1999 Foreclosure*

Council contends that the circuit court erred in invalidating the January 15, 1999 foreclosure sale. To support its assertion Council argues: (1) Brooks did not timely file an injunction to stay foreclosure proceedings, (2) after the foreclosure, Brooks "lost all rights to redeem the property," and (3) Brooks's exceptions to the sale "are without merit and do not affect the validity of such sale." [6] Brooks counters that Council acted in bad faith in denying his right of redemption.

The Maryland Contract Lien Act ("Act"), codified at Md. Code (1974, 2003 Repl.) §§ 14–201 *et seq.* of the Real Property Article ("RP"), provides for the creation of a lien by contract. Payment of condominium assessments, together with interest, late charges, costs of collection, and reasonable attorney's fees, "may be enforced by the imposition of a lien on a unit in accordance with the [Act]." RP § 11–110(d). Thus, Council was authorized to impose a lien on Brooks's unit for condominium assessments when he failed to pay his condominium assessments. RP § 14–204 of the Act provides, in pertinent part, that "[a] lien may be enforced and foreclosed by the

---

**5.** Recently, in *Ver Brycke v. Ver Brycke,* 379 Md. 669, 695, 843 A.2d 758 (2004), the Court of Appeals considered the "murky undertaking" of determining whether a claim sounds in law or in equity. Although it concluded that claims seeking the repayment of money sound in law, it did not address foreclosure proceedings specifically.

**6.** We have consolidated and re-arranged Council's contentions.

party who obtained the lien in the same manner, and subject to the same requirements, as the foreclosure of mortgages or deeds of trust on property in this State containing a power of sale or an assent to a decree." *Id.* at § 14–204. Thus, the foreclosure procedures contained in Title 7 of the Real Property Article and Chapter 14 of the Maryland Rules govern a contract lien foreclosure.

### 1. *Timeliness of Filing Injunction*

██ Council contends that, because Brooks filed an injunction to stop the foreclosure sale after it had already occurred, the request was untimely, and, therefore, the court could not have relied on it when invalidating the sale. The court, however, did not invalidate the foreclosure sale on the basis of Brooks's Emergency Motion for Temporary Restraining Order and for Preliminary Injunction or Emergency Motion for Appropriate Relief. In fact, the court refused to rule on that motion. Instead, the court invalidated the sale on the basis of the exceptions to the foreclosure sale that Brooks filed. Council's first contention fails.

### 2. *Right to Redeem*

 Council's second contention is that Brooks lost his right to redeem the property once it was sold at foreclosure. It is true that even though the jurisdiction of equity may not become complete until the filing of the report of sale, the right of redemption is "divested by [a] *valid* foreclosure sale." *Butler v. Daum,* 245 Md. 447, 453, 226 A.2d 261 (1967) (emphasis added). "[U]nless satisfactory proof is shown before final ratification that the sale should be set aside . . . all rights of the mortgagor[ ] . . . are deemed to have ceased to exist as of the date of sale." *Id.* In Maryland, "a tender of the amount due will prevent a foreclosure sale, since the mortgagor has an unqualified right to redeem." *Better v. Williams,* 203 Md. 613, 618, 102 A.2d 750 (1954). The court invalidated the foreclosure sale based on its determination that, prior to the sale, Council wrongly refused to accept Brooks's tender of $3,411 to satisfy the assessment debt. The court stated:

And you know what that figure stands for, that is the assessment debt, $3,411, that is the assessment debt, and that's the point that the Court of Special Appeals sent this back, because had he paid the $3,411 at that time there would have been no sale.

\* \* \*

If he paid that amount at that time, there may be something else he owes beyond that point for having done something else, but that's the point at which that sale was made, and if he cleans that up, if he offered that amount at the time that the sale was made, what was owed, that should have stopped all of this.

Because the court set aside the sale, Council's claim that the court erred in allowing Brooks the right to redeem his property after it was sold does not accurately reflect the circuit court's decision. Rather, the issue becomes whether the sale was properly set aside.

### 3. Exceptions

Council's third contention is that the court erred in invalidating the foreclosure sale based on Brooks's exceptions to the sale. Council argues generally that the filed exceptions are without merit and should not have affected the foreclosure sale.

Pursuant to Md. Rule 14–305(d),

[a] party, and, in an action to foreclose a lien, the holder of a subordinate interest in the property subject to the lien, may file exceptions to the sale. Exceptions shall be in writing, shall set forth the alleged irregularity with particularity, and shall be filed within 30 days after the date of a notice issued pursuant to section (c) of this Rule or the filing of the report of the sale if no notice is issued. Any matter not specifically set forth in the exceptions is waived unless the court finds that justice requires otherwise.

As explained in *Gordon on Maryland Foreclosures,* 1081 (4d. 2004), "The rules relating to ratification were summarized one hundred twenty years ago[.]"

"The contract of sale in such cases being one between the court, as vendor, and the purchaser, it is never regarded as consummated until it has received the sanction of the court. *Wagner v. Marshall,* 6 Gill, 100. **All objections therefore to the sale on the ground of error, mistake, or misrepresentation, either in regard to the terms or manner of sale; or in regard to the nature and character of the interest in the property decreed to be sold, are open for such consideration before final ratification; and when such objections are made the court will either ratify or set aside such sale as equity and good conscience may require.**["] *Bolgiano v. Cooke,* 19 Md. 375 [1863].

*Id.*

The opponent of the sale has the burden of proving to the court that the sale was invalid and unfair. *Ten Hills Co. v. Ten Hills Corp.,* 176 Md. 444, 449, 5 A.2d 830 (1939); *J. Ashley Corp. v. Burson,* 131 Md.App. 576, 582, 750 A.2d 618 (2000). A " ' "court will not set aside [a foreclosure] sale merely because it brings loss and hardship upon the mortgagor." ' " *J. Ashley Corp.,* 131 Md.App. at 583, 750 A.2d 618 (citations omitted). " ' "It is essential to the prompt administration of justice that the rule be inviolably observed that no court shall set aside a foreclosure sale merely because of harmless errors or irregularities ... or for any slight or frivolous reasons not affecting the substantial rights of the parties." ' " *Id.* (citations omitted).

Brooks filed ten exceptions to the January 15, 1999, foreclosure sale:

1. [Council] and Trustee Emig fraudulently deprived [Brooks] of his right of redemption by demanding excessive and unlawful payments as a condition of redemption.

\* \* \*

2. [Council] and Trustee Emig fraudulently deprived [Brooks] of his right of redemption by failing, prior to initiating foreclosure proceedings, to demand of [Brooks] a lawful payment necessary for him to exercise his right of

redemption; this despite specific request from [Brooks] for such demand.

\* \* \*

3. Trustee Emig breached his fiduciary duty to [Brooks] and to the Court by his blatant acts of gamesmanship to the consistent detriment of [Brooks] and short term benefit of [Council], and by his conflicting roles and loyalties as both trustee for the protection of all with equitable rights (including [Brooks]) and as counsel to [Council] and to its Managing Agent.

\* \* \*

4. The sale was not fairly conducted in that: (a) the advertisement required excessive interest (16%) on sale price in light of current market interest; (b) the resale was premature and based upon unlawful demands; (c) the sale was not well attended; and (d) the sale price was preset by Trustee with an eye toward establishing minimum amount Trustee believed necessary to avoid the fate of the first sale, and not toward "a view to obtain as large a price as might, with due diligence and attention, be fairly and reasonably obtainable under the circumstances."

\* \* \*

5. The sale price at foreclosure is so grossly inadequate as to shock the conscience.

\* \* \*

6. The sale price is so grossly inadequate and when combined with irregularities in the original sale and in the resale constitutes a constructively fraudulent sale.

\* \* \*

7. The resale was premature in that the provisions of Maryland Rule 14–205 were not complied with prior to the resale.

\* \* \*

8. The instant resale is precluded by the equitable considerations underlying Maryland Rule 14–205 (to wit: that after hearing the Court "fix the amount of the debt", and

"provide a reasonable time within which payment may be made" before resale).

* * *

9. The resale was not duly authorized by [Council's] Board of Directors.

* * *

10. [Council] lacks clean hands.

Because it appears that the circuit court essentially relied on the first and second exceptions in invalidating the sale, we will address only those exceptions.

▊ Brooks argued that Council was obliged to accept his good faith tender and that it sought to avoid the tender by claiming "excessive" amounts due in its supplemental statement of indebtedness. Therefore, the court should invalidate the foreclosure sale. The circuit court agreed, finding that Brooks had attempted in good faith to exercise his right of redemption when he tendered $3,411 to satisfy the lien for the unpaid and accelerated 1995 and 1996 condominium fee assessments to Council, and that Council had wrongly refused to accept this tender.

*Black's Law Dictionary* 1193 (7th ed. 1999) defines tender as "[a]n unconditional offer of money or performance to satisfy a debt or obligation. The tender may save the tendering party from a penalty for nonpayment or nonperformance or may, if the other party unjustifiably refuses the tender, place the other party in default." It is similarly explained in *American Jurisprudence Second* to mean

> an unconditional offer of payment consisting in the actual production, in current coin of the realm, of a sum not less than the amount due on a specific debt or obligation. Tender of payment is an offer to perform, often by paying money, coupled with a present ability of immediate performance, which, were it not for the refusal of cooperation by the party to whom tender is made, would immediately satisfy the condition or obligation for which tender is made.

74 AM. JUR. 2d *Tender* § 1 (2003).

That text continues:

The purpose and object of tender is to enable the other party to accept the money and close the transaction and thus relieve the party making the tender from further liability on the debt or obligation. One of the effects of an unjustifiable refusal of a sufficient, bona fide tender is to place the refusing party in default, and to permit the tendering party to exercise his remedies for breach of contract; this may be one of the legitimate purposes the tenderer may seek to accomplish by his tender.

*Id.* at § 2.

In explaining an effectual tender, *American Jurisprudence Second* explains:

The amount offered by the debtor to his creditor must be at least equal to the whole amount then due or accrued on the debt or obligation to constitute an effectual tender.... Generally, a tender must include everything to which the creditor is entitled, and a tender of any less sum is nugatory and ineffective as a tender. It must include interest due, costs then due or accrued, and attorneys' fees to which the creditor has become entitled by force of the agreement of the parties, as by commencement of suit or otherwise.... [I]f a debtor requests of a creditor a statement of the balance owing on his account, the creditor being in sole possession of that information, and the creditor either neglects or refuses to disclose the correct amount owing, the debtor's tender of what he believes, in good faith, is owing is deemed sufficient, even if it is a smaller amount than that actually owed.

*Id.* at § 20. *See also* Allan Manley, Annotation, *Creditor's Failure to Disclose Correct Amount Due as Affecting Sufficiency of Debtor's Tender of Amount which Debtor Believes to be Due, but which is Less than Amount Actually Due,* 82 A.L.R.3d 1178, § 2 (1978).

Maryland courts have recognized these general principles and have considered what constitutes a sufficient tender. In *Kent Building & Loan Co. v. Middleton,* 112 Md. 10, 13–14, 75 A. 967 (1910), the refusal to accept a tender of a mortgage

pay-off was raised, as in this case, by exceptions to the ratification of sale. The lower court sustained the exceptions and gave the dealer 30 days to renew the tender before the property could be sold. The Court of Appeals affirmed, stating: "As a mortgagee has no right to make the sale after a lawful tender of the amount due, the sale, when made, may be excepted to by the party authorized to redeem the mortgage and who made the tender." *Id.* at 17, 75 A. 967.

In *Wolf v. Oldenburg,* 154 Md. 353, 140 A. 494 (1928), the Court of Appeals opined in a mortgage case that a bona fide attempt at tender was sufficient to preserve the right of redemption. In *Platsis v. Diafokeris,* 68 Md.App. 257, 511 A.2d 535 (1986), the appellants argued that, because appellee demanded an excessive amount above what was due, the argument of insufficient tender was waived. Appellants in *Platsis* conceded that "their tender was insufficient both as to amount and because it was conditional." *Id.* at 263, 511 A.2d 535. Nevertheless, they argued that "tender is excused where the creditor has clearly indicated that he is unwilling to accept what is due in discharge of the debt." *Id.* In that case, we said:

Appellants' only tender was insufficient because it was less than the full amount due on the note and also because it was conditional; it was not, therefore, a valid or effective tender which relieved appellants of liability for costs, interest, or attorney's fees. On the other hand, the amount appellee demanded to discharge fully that note, because based upon a faulty premise, *i.e.* that the note provided for interest computed on a base principal amount of $29,000.00, rather than on $25,000.00 as appellants contended, was greater than that actually due and, as later events proved, was excessive. Furthermore, the demand was firm: appellants' efforts, through counsel, to resolve the dispute met with no success. Moreover, the confluence of the faulty premise, based on an ambiguity in the note drafted by appellee, and the firmness of appellee's reliance on that premise make patent, as the trial judge found, that "no agreement [could] be reached as to the balance due until the conflict as to the base debt subject to interest [was] re-

solved." We think it apparent from the record that appellee would not have accepted any tender less than the amount of his demand, not even one in the amount ultimately found by the court to be due. Consequently, in view of the firmness of appellee's demand with regard to what was required to discharge the note it would have been a "futile gesture" for appellants to have tendered even the actual amount due. *Id.* at 267–68, 511 A.2d 535 (citations omitted).

Courts in other jurisdictions have reached similar conclusions. *See Ford Motor Credit Co. v. Goings*, 527 P.2d 603, 607–08 (Okla.Ct.App.1974); *Agostini v. Colonial Trust Co.*, 44 A.2d 21, 23 (Del.Ch.1945); *Graves v. Burch*, 26 Wyo. 192, 181 P. 354, 356 (Wy.1919); *Downing v. Plate*, 90 Ill. 268 (1878). In summarizing those decisions, it has been said that "where a creditor appears intentionally to have grossly overstated the amount due on an obligation, a debtor's good-faith tender of an amount less than the amount actually due is a sufficient tender." Allan Manley, Annotation, *Creditor's Failure to Disclose Correct Amount Due as Affecting Sufficiency of Debtor's Tender of Amount which Debtor Believes to be Due, but which is Less than Amount Actually Due*, 82 A.L.R.3d 1178, § 5a (1986). That annotation continues:

In some cases, the debtor and creditor both understand clearly the components of the claim the creditor asserts, and they agree as to the amount of each component, but the debtor contends that one particular component, such as attorneys' fees, or other court costs, is not correctly owing to the creditor. Where tender was in an amount less than the actual amount owing, but where tender was made in good faith, and for what the debtor believed was the entire amount owing, a creditor demanding a much larger amount through error of law has been held to have waived insufficiency of tender, where no objection was made on the basis of what was actually tendered being insufficient under a correct legal interpretation.

*Id.* at § 5b.

Council argues that, because the circuit court had not yet determined the amount Brooks owed to Council and it was

uncertain as to the expenses and attorneys' fees from the first sale that it would be able to recover, it was justified in requesting $31,114.64 and not accepting a tender less than that amount. Furthermore, Council claims that the demand, later determined incorrect by the court, should not have affected the sale because an incorrect statement of mortgage debt does not constitute grounds for setting aside a foreclosure sale.

Relying on *Pacific Mortgage & Investment Group, Ltd. v. La Guerre,* 81 Md.App. 28, 33, 566 A.2d 780 (1989) (*quoting Md. Perm. Ld. & Bld. Soc. v. Smith,* 41 Md. 516, 522 (1875)), Council argues that, " '[i]f the statement [of debt] is erroneous in not showing the true balance due upon the mortgage, it is open to correction, when the account may be stated by the auditor; but furnishes no reason for setting aside the sale.' " We believe Council's reliance on *Pacific Mortgage* is misplaced.

The holding in *Pacific Mortgage* is "that when a petition to foreclose a mortgage pursuant to an assent to a decree is filed, stating simply that the mortgage is in default, such petition is sufficient to sustain the foreclosure proceeding so long as any one of the provisions of the mortgage, the violation of which can constitute a default under the terms of the mortgage, is in default." *Id.* at 40–41, 566 A.2d 780. In that case, it was conceded that the mortgaged properties were not insured as required by the mortgage. Therefore, there remained a default that permitted the foreclosure.

In this case, Brooks, as he was entitled to do, sought to cure the alleged default prior to the sale and thereby stop the foreclosure proceedings. To require that Brooks pay almost ten times more than that for which the lien had been established, and approximately four times more than that which was later reflected in the auditor's report, was effectively a denial of the right to redeem.

Moreover, Council could not legally assert a right to attorneys' fees and costs from the first foreclosure proceeding. In *Queen City Perpetual Building Assoc. v. Price,* 53 Md. 397

(1880), the Court found that when a mortgage proceeding is void, the party effecting the sale bears all the costs and expenses. The Court stated:

But where, as in this case, the mortgagee becomes the purchaser at his own sale, the sale being void, he acquires no rights, either legal or equitable, by means of the sale. In such case, the parties stand as they did before the ineffectual form of sale; and all the costs and expenses attending such ineffectual sale must be borne by the mortgagee, as the consequence of an unauthorized proceeding.

*Id.* at 401.

Brooks followed the procedures outlined in the Maryland Rules to invalidate a foreclosure sale. He filed exceptions to the sale, based on what he alleged to be an incorrect assessment of what was claimed due by Council. In his effort to cure the default and discharge the lien, he relied on the auditor's statement from the invalidated first sale, which reflected that the amount outstanding was $3,411. The court agreed with Brooks. It determined the underlying debt to be that which had been determined by the auditor, plus interest and costs.[7] The $31,114.64 alleged to be due by Council was rejected.

THE COURT: And you know what that figure stands for, that is the assessment debt, $3,411, that is the assessment debt, and that's the point that the Court of Special Appeals sent this back, because had he paid the $3,411, at that time there would have been no sale.

And that's what the auditor says it was. I am looking at it, assessment debt $3,411.

MR. EMIG: That's correct, Your Honor, but at the time of the sale it was over-it was $5,400.

THE COURT: At the time of the sale that I am talking about, which is the sale that took this to the Court of Special Appeals, the assessment debt was $3,411.

---

7. We will address the percentage of interest to be assessed in the following section of this opinion.

MR. EMIG: The underlying assessment debt.

THE COURT: There may be something that will come along later, but that would have cleaned up what was owed at that time.

The circuit court was not clearly erroneous in its determination that Brooks had attempted a good faith tender when he submitted to Council $3,411 and, when the tender was refused, sought clarification from Council on the amount due. Council's refusal letter indicated that Council was unwilling to accept any amount less than $31,114.64, which included attorneys' fees for the prior invalid foreclosure proceeding. This was sufficient to support a finding that tendering the additional $162.89, which Brooks had calculated was due since the last sale, would be a futile gesture.

## 4. Interest

Next, Council contends that the court erred in determining that the applicable annual interest rate was 6% rather than 18%. Council argues that its "governing documents allow 18% interest per annum, which is the maximum amount allowed by Real Property Article § 11–110." The circuit court, however, calculated interest at 6%, pursuant to GCA's governing documents. Council argues that the court's reliance on GCA's Declaration and Bylaws was incorrect.

### a. Governing Documents

In determining whether Council's or GCA's governing documents are controlling, we begin by considering Brooks's deed, which conveys to him:

> Unit numbered 179 in a Horizontal Property Regime known as "GREENBRIAR CONDOMINIUM–PHASE I" [Council] **established by a Condominium Declaration dated November 11, 1974 and recorded November 14, 1974 in Liber 4435 at folio 682 [Council Declaration]** as amended by an Amended Declaration dated December 17, 1974 and recorded in Liber 4446 at folio 767, and as shown on a Plat of Condominium Subdivision entitled "GREENBRIAR

CONDOMINIUM–PHASE I" [Council] recorded in Plat Book W.W.W. 90 at Plats 50 through 57 inclusive as amended by a Plat of Correction recorded in Plat Book W.W.W. 90 as Plat 47, among the Land Records of Prince George's County, Maryland, together with the facilities and other appurtenances to said Unit, which Unit and appurtenances have been more specifically defined in the Declaration aforesaid, and including the fee in an undivided interest in the common elements of said Regime appurtenant to said Units as such interest is set out and defined in the said Declaration as the same may be lawfully revised or amended from time to time.[8]

**TOGETHER WITH all of the rights and subject to the obligations contained in a Declaration of Covenants dated November 11th, 1974, and recorded November 14th, 1974 in Liber 4435 at Folio 623 [GCA Declaration].**

(Emphasis added.)

Brooks's unit is subject to both the Council Declaration and the applicable provisions of the Act, in addition to the GCA Declaration. As the owner of the unit, he maintains, in effect, dual citizenship, with its respective rights and obligations, in both the GCA and Council.

 Before we consider which of these two documents controls in terms of assessing interest due for liens, we point out that Brooks did not raise the issue of whether Council has the authority to establish a lien and sue for unpaid fees on behalf of the GCA. It is clear from the governing documents that both Council and GCA can impose assessments on the condominium owners. Moreover, both parties readily concede that Council historically has collected assessments due on behalf of the GCA from the condominium owners. This is permitted in the GCA Declaration, which states:

If a Multi-family Structure or group of Living Units has been submitted to a Condominium regime, then the Owners of Living Units located therein may pay the monthly and/or

---

8. Council apparently did not incorporate until February 24, 1986.

quarterly assessments for both the condominium and the Association by one payment to the Board of Directors of the condominium, whereupon the Board of Directors of the condominium shall promptly deliver to the Board of Directors of the Association the portion of such payment attributable to the assessments at the Association.

Council's Amended Bylaws state that its Board of Directors shall have the authority to "[e]nforc[e] by legal means the provisions of the [Council] Declaration, these By–Laws, and the rules and regulations for the use of the Condominium adopted by it, and bring[ ] any proceedings which may be instituted on behalf of the unit owners." We question whether Council has the legal authority to sue on behalf of the GCA for unpaid GCA assessments, and whether under RP § 14–202(a)(2)(i) it is "[t]he party entitled to establish and enforce" a lien for unpaid GCA assessments. Because Council's authority to sue and establish a lien for unpaid GCA assessments was not challenged in the circuit court, the issue is deemed waived, and we shall assume for the purposes of this opinion, without deciding, that Council does indeed have the authority to establish and enforce a lien for GCA assessments.

In regard to the interest due on unpaid assessments, the GCA Declaration provides: [9]

> *Section 9. Effect of Non–Payment of Assessment. The Personal Obligation of the Owner: The Lien; Remedies of Association*
>
> If any assessment is not paid on the date when due (as specified in Sections 7 and 8 hereof), then such assessment shall be deemed delinquent and shall, together with such interest thereon and cost of collection thereof as are hereinafter provided, continue as a lien on the Living Unit or Multifamily Structure which shall bind such Living Unit or Multifamily Structure in the hands of the then Owner, his heirs, devisees, personal representatives, successor and as-

---

9. No Amended Declaration was provided to us; therefore, we assume that the original GCA Declaration is the operable declaration.

signs. In addition to such lien rights, the personal obligation of the then Owner to pay such assessment, however, shall remain his personal obligation and shall not pass to his successors in title (other than as a lien on the land) unless expressly assumed by them. **If the assessment is not paid within thirty (30) days after the delinquency date, the assessment shall bear interest from the date of delinquency at the rate of six percent (6%) per annum[.]**

(Emphasis added.)

The GCA Declaration also provides:

In the event of a default by an Owner in paying any Operating Expenses or other sum assessed against him which continues for a period in excess of thirty (30) days, such Owner and his Permittees shall not be permitted to utilize the privileges of the easements granted in this Declaration until the default is cured, and such Owner shall be obligated to pay interest on the amounts due at the rate of eight percent (8%) per annum from the due date thereof.

Operating Expenses are defined as:

(i) All expenses of administration, operation, maintenance, repair or replacement of, and all insurance with respect to those items covered by subparagraphs (m) through (r) of this Article; [items (m) through (r), reference shared utility equipment amongst the owners, including, for example: cooling towers, sewer lines, main piping lines, etc. . . . .]

(ii) Real Estate Taxes and assessments attributable to that portion of the Real Property, and improvements thereon, covered by subparagraphs (m) through (r) of this Article (such attribution shall be as the applicable land areas and improvements are separately assessed, and if they are not separately assessed applicable land areas shall be allocated on a pro rata acreage basis from the larger assessed parcel, and applicable improvements shall be allocated on a pro rata book cost basis from all improvements included in the larger assessed parcel);

(iii) The charge imposed by the Developer as Operating Expenses for the administration, operation, maintenance, repair or replacement of an insurance on those items covered by Subparagraphs (k) and (*l*) [the treatment plant and pumping station area and facilities] shall be based upon the charge by the Washington Suburban Sanitary Commission (W.S.S.C.) for water used and consumed upon the Property. Such charge shall be determined and in the same manner, and shall be in the same amount, as would have been if the sewer service was provided by the W.S.S.C.

(iv) All charges incurred by the agent of the owners of the Property designated in accordance with Part III, Article VIII, hereof; and

(v) All other sums lawfully assessed or incurred in accordance with the provisions hereof.

GCA's Amended By-Laws provide that 12% interest is due on unpaid assessments. The applicable section states:

As more fully provided in the DECLARATION, each member is obligated to pay to the CORPORATION annual and special assessments which are secured by a continuing lien upon the property against which he assessment is made. Any assessments which are not paid when due shall be delinquent. If the assessment is not paid within thirty (30) days after the due date, the assessment shall, unless waived by the Board of Directors, bear interest from the date of delinquency at the rate of twelve percent (12%) per annum, and the CORPORATION may, at any time after fifteen (15) days written notice to the delinquent Owner, bring an action at law against the Owner personally obligated to pay the same or foreclose the lien against the property, and interest costs, and reasonable attorney's fees of any such action shall be added to the amount of such assessment. No Owner may waive or otherwise escape liability for the assessments provided for herein by nonuse of the Common Areas or abandonment of his Condominium Unit.

A provision in the Amended Bylaws reads: "In the event of a conflict between the DECLARATION and the ARTICLES

OF INCORPORATION or the BY–LAWS, the DECLARA-TION shall control...." Therefore, the Declaration trumps the Council's Bylaws. Council has not argued that the 8% rate should apply, and, thus, we are persuaded that the 6% interest rate should apply to any unpaid GCA assessments at issue in this case.[10]

The interest rate to be applied to unpaid Council assessments was addressed in Council's original By–Laws:

> (e) Interest. In the event of a default by any Owner in paying any Common Expenses or other sum assessed against him which continues for a period in excess of fifteen (15) days, such Owner shall be obligated to pay interest on the amounts due at the rate of eight percent (8%) per annum from the due date thereof.

That provision was modified by the Amended By–Laws, which state, in pertinent part: [11]

> (a) Each owner of any unit, by acceptance of a deed therefor, whether or not it shall be so expressed in such deed, is deemed to covenant and agree to pay to the Council: (1) annual assessments or charges, (2) special assessments to be established and collected as hereinafter provided, and (3) specific assessments against any particular unit which are established pursuant to the terms of these By–Laws. All such assessments, together with management charges, interest, costs, and reasonable attorney's fees, in the maximum amount permitted by law, and the maximum late charge as permitted by Section 11–110(e) of the Act, shall be a charge on the unit and shall be a

---

**10.** At the July 6, 1999 hearing, there was the following colloquy:
The Court: "You give him the six percent that is due."
Do you agree that is what the contracts says, six percent?"
Mr. Emig: "I will agree that it is in the declaration, yes."
The Court: "It is in the declaration?"
Mr. Emig: "Yes."
The Court: "Give him that, and I am going to dismiss the foreclosure...."

**11.** Neither party alleges any defect in the adoption of the Amended By Laws on November 8, 1983.

continuing lien upon the unit against which each such assessment is made.

Md.Code (1974, 2003 Repl. Vol.) § 11–110(e) of the Real Property Article states:

(e) *Interest on unpaid assessment; late charges; demand for payment of remaining annual assessment.*—(1) Any assessment, or installment thereof, not paid when due shall bear interest, at the option of council of unit owners, from the date when due until paid at the rate provided in the bylaws, not exceeding 18 percent per annum, and if no rate is provided, then at 18 percent per annum.

Accordingly, under Council's governing documents, 18% interest is due on unpaid assessments or charges validly established under the governing documents of the condominium regime as permitted by the Act.

As indicated above, the record establishes that historically Council has collected GCA's assessments on GCA's behalf. The statement of debt does not distinguish between assessments due to Council and those due to GCA, but it is not disputed that the established lien included both GCA and Council assessments.

We are persuaded that the circuit court erred in assessing 6% interest on all unpaid assessments. GCA assessments "may" be paid to Council, but they are to be "promptly" delivered to GCA. Even if we assume that Council may establish and enforce a lien for GCA's assessments, GCA's assessments and Council's assessments do not lose their identity as independent and separate assessments and become a single assessment.[12] Thus, on remand, 6% interest should be

---

**12.** The Declaration indicates that, when there is an unpaid assessment, the Association may, at any time after fifteen (15) days written notice to the delinquent Owner, bring legal action against the Owner personally obligated to pay the same or may enforce or foreclose the lien against the Living Unit, or Multifamily Structure by legal or equitable proceedings; and in the event a judgment is obtained, such judgment shall include interest on the assessments above provided and a reasonable attorney's fee to be fixed by the court together with the costs of the action.

applied to that portion of the debt attributable to GCA assessments, and 18% interest to the portion attributable to Council assessments.[13]

### b. Date Through Which Interest Should be Calculated

■ Council also contends that the circuit court erred in determining that Brooks only owed interest through May 10, 1996, the date of the first foreclosure sale that was later invalidated. Council argues that "[t]here was no legal basis for the Court to deny interest after May 10, 1996." We agree.

Although the first foreclosure sale was invalidated, Brooks remained liable for the unpaid assessments, and, therefore, the interest continued to accrue. Brooks argues that the "[b]asic tenets of equity, due process and fairplay, mandate that Brooks not be charged any interest, late fees or other item of charge after May 10, 1996 which accrued, if at all, during litigation on [Council's] ineffectual sale...." Brooks also contends that Council "*waived any claim for interest* in this matter" because it was not until the statement of indebtedness, dated December 29, 1998, that Council made a claim for interest. Brooks provides no support for his arguments, and he does not explain why he should be "rewarded" by not having to pay interest on an unpaid assessment simply because the foreclosure sale was invalidated. It is uncontested that, despite the improper foreclosure sale on May 10, 1996, an indebtedness remained. At any time after May 10, 1996, Brooks could have tendered the amount due or paid that amount into the court registry and stopped the interest charges. On the other hand, interest and late charges would not be appropriate after the tender was rejected.

### II. Attorneys' Fees

Council next argues that the court erred in awarding Brooks attorneys' fees. Council asserts three reasons for the

---

13. We note that the circuit court, in awarding attorneys' fees, distinguished between services performed in collecting GCA assessments and those related to Council assessments.

court's error: 1) there was no agreement providing for the recovery of attorneys' fees; 2) "Brooks was not the prevailing party in this litigation"; and 3) Brooks should not be awarded fees for his *pro se* representation. We shall address each of these contentions individually.

*1. Agreement for Attorneys' Fees*

Maryland courts follow the "American Rule," which provides that generally a prevailing party is not entitled to recover attorneys' fees as damages. *Atlantic Contracting & Material Co., Inc. v. Ulico Cas. Co.*, 380 Md. 285, 315–16, 844 A.2d 460 (2004); *Hess Constr. Co. v. Board of Educ.*, 341 Md. 155, 160, 669 A.2d 1352 (1996). There are limited exceptions to the rule, which although rarely employed, provide for the recovery of counsel fees. *Caffrey v. Department of Liquor Control for Montgomery County*, 370 Md. 272, 280, 805 A.2d 268 (2002). For example, attorneys' fees may be awarded when:

(1) "parties to a contract have an agreement to that effect"; (2) "there is a statute which allows the imposition of such fees"; (3) "the wrongful conduct of a defendant forces a plaintiff into litigation with a third party"; and (4) "a plaintiff is forced to defend against a malicious prosecution."

*Id.* (citing *St. Luke Evangelical Lutheran Church, Inc. v. Smith*, 318 Md. 337, 345, 568 A.2d 35, 38–39 (1990) (footnote omitted) (citations omitted)). "When attorney's fees are permitted, the award is ' "a factual matter which lies within the 'sound discretion of the trial judge and will not be overturned unless clearly erroneous.' " ' " *Holzman v. Fiola Blum, Inc.*, 125 Md.App. 602, 637, 726 A.2d 818 (1999) (citations omitted).

"Where an award of attorney's fees is called for by the contract in question, the trial court will examine the fee request for reasonableness, even in the absence of a contractual term specifying that the fees be reasonable." *Atlantic Contracting & Material Co., Inc.*, 380 Md. at 316, 844 A.2d 460. In reaching its decision, " 'the trial court's evaluation of a claim for attorneys' fees must be based on a record that

includes information that sufficiently and competently supports the court's findings.'" *Holzman,* 125 Md.App. at 639, 726 A.2d 818 (quoting *Maxima Corp. v. 6933 Arlington Development Ltd.,* 100 Md.App. 441, 458, 641 A.2d 977 (1994)). The trial court should consider:

> " '(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>
> '(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> '(3) the fee customarily charged in the locality for similar legal services;
>
> '(4) the amount involved and the results obtained;
>
> '(5) the time limitations imposed by the client or by the circumstances;
>
> '(6) the nature and length of the professional relationship with the client;
>
> '(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
>
> '(8) whether the fee is fixed or contingent.' "

*Holzman,* 125 Md.App. at 639, 726 A.2d 818 (quoting *Reisterstown Plaza v. General Nutrition Center,* 89 Md.App. 232, 246–47, 597 A.2d 1049 (1991) (quoting Rule of Professional Conduct 1.5(a))).

*a. Attorneys' Fees for First Appeal*

 The circuit court granted Brooks "reasonable attorneys' fees for his prior appeal to the Court of Special Appeals in those proceedings, such amount to be determined following a hearing on this issue[.]" At the July 6, 1999 hearing, the court stated:

> Well, you have to be careful here, sir, because the ratification—you know, it should work both ways. When a foreclosure takes place, attorney fees are granted to the plaintiff, to the trustees for the foreclosure to the plaintiff for the foreclosure.

We restrict the attorney fees, but they are granted. We restrict them to something that is reasonable, and they have increased because the cost of living has increased, and that sort of thing, and when the defendant goes into bankruptcy and the plaintiff has to go into bankruptcy to lift the automatic stay, we grant an additional amount of money for attorney fees.

So it would appear to me that if we do that for the plaintiff, but it is the defendant who prevails, why not? The defendant also should be entitled to attorney fees no more so than the plaintiff, and we would restrict those as we would for the plaintiff. I see nothing wrong with that, even if it is a foreclosure case.

\* \* \*

I don't have a problem with attorney fees for the appeal. I don't have a problem on that, because that is what sent it back, and after having heard evidence on that particular issue that I was directed to hear by the Court of Special Appeals to determine whether or not the amount of money that was paid at that time for the property shocked the conscience of the court, and I found that it did, and I set the sale aside, and I think you are entitled to attorney fees for the appeal, and that that followed the appeal, to where I set it aside.

\* \* \*

The appeal, I would pay for that in attorney's fees, . . . because you prevailed on that.

Had the plaintiff prevailed on that, the plaintiff would have had its fees put to the court for the auditor to approve them, and I have no problems with that.

So what is sauce for the goose is saws [sic] for the gander. I don't have a problem with that.

In response, Emig argued that the typical foreclosure plaintiff is entitled to attorney's fees because of the contractual "authorization and deed of trust." The court was undeterred:

I understand. But I am going to pay it to the other side. When you say you are entitled to these on attorney fees, but

the other side never gets any. Somehow or other, I think there should be a level playing field in a case such as that.

The circuit court ordered fees based on the fact that in a traditional foreclosure case the debtor plaintiff is ordinarily permitted to recover fees. As Council argues, attorney's fees in foreclosure sales are usually awarded pursuant to the contract documents between creditor and debtor. We believe that it was error to award attorneys' fees in an effort to "level [the] playing field" or to treat the creditor "goose" and the debtor "gander" the same.

### b. Attorneys' Fees Pursuant to the GCA Document [14]

 The trial court also awarded Brooks a percentage of his reasonable attorneys' fees for work after December 17, 1997, based on the percentage of the assessments collected that represent GCA's assessments. The GCA Declaration provides:

> In any proceeding [15] arising out of any alleged default by an Owner, the prevailing party shall be entitled to recover the costs of the proceedings, and such reasonable attorneys' fees as may be determined by the court.

Council argued that the GCA provision was not applicable because GCA was not a party to the proceeding. In other words, the provision does not apply in an action between Council and owner.

At the July 6, 1999, hearing, the court stated:

> I think this is a distinction without a difference, sir. Because you can't tell me any time when that other organization [GCA] has filed a lien or brought a suit, and if it says

---

**14.** Council's Declaration provides for Council's recovery of attorneys' fees for its enforcement of a lien. There is no corresponding provision that allows the unit owner to recover attorneys' fees.

**15.** *Blacks Law Dictionary* 1221 (7th ed. 1999) defines proceeding as "[t]he regular and orderly progression of a lawsuit, including all acts and events between the time of commencement and the entry of judgment." *Miriam Webster's Collegiate Dictionary* 927 (10th ed. 2000) defines proceeding as a "legal action."

that it grants attorney fees when the other side prevails, and the other side prevails in a suit brought about by the parent organization [Council], which collects for that organization [GCA], for those funds, and then you are going to tell me that the other side, for that portion of the funds, can't elect to have attorney fees granted, somehow or other, that doesn't make any sense.

\* \* \*

Well, my position is he can, and for whatever—and I don't know what it is, but for whatever that portion of it is that goes to that entity [GCA] that has the Declaration of Rights that says he can collect, if I ruled in his favor for that portion of whatever it is, then he is entitled to attorney fees for that portion.

We do not find the trial court's determination that the GCA provision is applicable to a proceeding to collect GCA assessments brought by Council to be clearly erroneous. The Declaration entitles the "prevailing party" to reasonable attorneys' fees "[i]n *any* proceeding arising out of *any* alleged default by an owner." (Emphasis added.) Although Council initiated the proceeding in this case, it was a proceeding "arising out of" Brooks's default in paying his GCA assessments. Moreover, there was no evidence that GCA ever brought an action for unpaid assessments on its own behalf, and the court could reasonably conclude that this proceeding represents the norm in collecting unpaid GCA assessments. Therefore, we will now consider whether Brooks was the "prevailing party."

### 2. Was Brooks the Prevailing Party?

■ The GCA Declaration provides that, in proceedings arising out of the alleged default by an Owner, the prevailing party shall be entitled to recover reasonable attorneys' fees. Brooks contends that, because he successfully convinced the trial court to invalidate the foreclosure sale, he was the prevailing party. Council argues that Brooks was not the prevailing party because, although he successfully prevented

the foreclosure sale, he was ultimately responsible to Council for the underlying assessment debt.

This Court has considered the concept of "prevailing party" in terms of awarding attorneys' fees in insurance litigation. In that context, we have said that " 'when an insured must resort to litigation to enforce its liability insurer's contractual duty to provide coverage for potential liability to injured third persons, the insured is entitled to a recovery of the attorneys' fees and expenses incurred in that litigation.' " *Commercial Union Ins. Co. v. Porter Hayden Co.*, 116 Md.App. 605, 708, 698 A.2d 1167 (1997) (quoting *Nolt v. U.S.F. & G.*, 329 Md. 52, 66, 617 A.2d 578 (1993)).

For approximately ten years, the parties vigorously contested "the extent to which Porter Hayden enjoy[ed] insurance liability coverage from Commercial Union." *Id.* at 617, 698 A.2d 1167. Much like this case, that case was considered several times on appeal. Commercial Union contended that "Porter Hayden lost the appeal in [the Court of Special Appeals], and neither side prevailed in the Court of Appeals," and therefore, "Porter Hayden simply was not a prevailing party in either appellate proceeding." *Id.* at 714–15, 698 A.2d 1167. We held that the court erred in denying attorneys' fees to Porter Hayden for fees incurred during the litigation and that "[a]s the prevailing party in this declaratory judgment action, Porter Hayden is entitled to be reimbursed by Commercial Union for all fair and reasonable attorneys' fees and expenses incurred in the course of this litigation." *Id.* at 709, 698 A.2d 1167. We stated that "[i]n deciding the entitlement to attorneys' fees incurred in establishing contested coverage . . . we do not determine which party was the 'prevailing party' on an inning-by-inning basis, but only at the end of the entire game." *Id.* at 715, 698 A.2d 1167. *See also Bond v. PolyCycle, Inc.*, 127 Md.App. 365, 384, 732 A.2d 970 (1999) (citing *Commercial Union*, 116 Md.App. at 698, 698 A.2d 1167). The Court found that, at "the end of the entire game," Porter Hayden was the prevailing party because the entitlement to attorneys' fees in a case to establish contested coverage "depends exclusively on whether that coverage is ultimate-

ly determined to exist.... The focus is exclusively on the bottom line." *Commercial Union*, 116 Md.App. at 713, 698 A.2d 1167.

The circuit court's focus in this case was directed to discrete parts of the overall proceeding. To chase the above metaphor, the court looked to Brooks's inning by inning success. When we focus on the score at the end of the game, i.e., the "bottom line," Brooks did not prevail.

The purpose of the "proceeding," from its inception to conclusion, was the collection of unpaid assessments alleged to be due both to Council and to GCA. Assessments, however they may be characterized, are the financial life blood of common interest communities such as homeowners and condominium associations. They are the taxes on which those communities run and are essential to their operation.

The Maryland Contract Lien Act establishes the appropriate procedure to collect such assessments. First, the right to the lien must be established, and only after its establishment can the association enforce that lien through foreclosure. In this case, the right to a lien for unpaid assessments was not challenged. It was only during the enforcement proceedings that Brooks cured his default and satisfied the lien. To be sure, the course of the proceeding was not straight, moving back and forth between Upper Marlboro and Annapolis, but at the end, Council's ultimate purpose in the proceeding was accomplished. Brooks won some major battles, but he ultimately lost the war that he occasioned by failing to pay his assessments in a timely fashion.[16]

### 3. Pro Se Representation

Even had Brooks, who is an attorney, been entitled to attorneys' fees, we are not persuaded that he could collect attorneys' fees for work on his own behalf. In Maryland,

---

16. This opinion should not be read to preclude, when appropriate, the recovery of attorney's fees under Maryland Rule 1–341, or any other sanction based attorney fee rule.

contractual provisions for the collection of attorneys' fees have been considered to be contracts of indemnity. *Weiner v. Swales,* 217 Md. 123, 125, 141 A.2d 749 (1958); *Webster v. People's Loan, Savings & Deposit Bank,* 160 Md. 57, 61, 152 A. 815 (1931); *Mortgage Investors of Washington v. Citizens Bank & Trust Co.,* 29 Md.App. 591, 595, 349 A.2d 647 (1976). In *Webster,* the Court of Appeals explained that attorneys' fees are payable "by way of indemnity, to the extent stipulated, for the expense of employing an attorney to collect by suit at law the principal debt." *Webster,* 160 Md. at 62–63, 152 A. 815.

In *Weiner,* the Court considered whether an attorney could collect fees for his own work in a confessed judgment case where the "borrowers agreed upon default 'to pay the costs and charges for collecting [$3,157], including attorney's commission of fifteen (15%) per cent for collection (said 15% to be entered as part of the costs)', and authorized the entry of judgment for the amount of the note 'including debt, interest and costs.'" *Weiner,* 217 Md. at 124, 141 A.2d 749. The circuit court found that

> [i]t seems implicit in the provisions of the note that the 15% commission shall be payable only to an attorney employed in the case or to the plaintiff in reimbursement for his expenses in employing such an attorney, and that plaintiff is not entitled to collect such additional compensation when he acts in proper person.

*Id.* at 125, 141 A.2d 749. The Court of Appeals agreed and explained, quoting *Gaither v. Tolson,* 84 Md. 637, 642, 36 A. 449 (1897):

> [I]n dealing with the covenant in a mortgage to pay attorney's commission incurred in its collection ... "[w]e would not decide that the holder of a mortgage could employ himself as attorney, or could employ a firm of which he was a member as his attorneys, and charge the expense of such employment of the proceeds of sale."

*Weiner,* 217 Md. at 126, 141 A.2d 749. The Court concluded that Weiner could only be reimbursed for his "actual monetary

expenses or disbursements incurred in the collection of the note." *Id.* We continued to explain that, "although we need not decide the question, that provision would be unenforceable if it meant that a lender, who is an attorney, is to receive attorney's fees for collecting the money he lent." *Id.*

In *Weiner,* the attorney was seeking to collect a personal debt, but we see little reason why the same principles would not be applicable when the attorney is the debtor and chooses to represent himself or herself. Certainly, there is nothing in the contract language to suggest that parties representing themselves are entitled to recover attorneys' fees that they have not incurred. *See Corazza v. Jacobs,* 277 A.D.2d 52, 53, 717 N.Y.S.2d 2 (2000) (stating that where a contract "expressly and unequivocally provided that the escrowee be indemnified by the parties to the contract for all costs, expenses, etc., including attorneys' fees, arising from its duties as their escrow agent, even if it rendered legal services to itself," the escrowee appearing pro se is entitled to recover attorneys' fees); C. Clifford Allen, III, *Annotation, Right of Party Who Is Attorney and Appears for Himself to Award of Attorney's Fees Against Opposing Party as Element of Costs,* 78 A.L.R.3d 1119 (1977) (synopsis of how courts treat the question of awarding attorney's fees to an attorney representing himself in the action).

## CROSS–APPEAL

On his cross-appeal, Brooks contends that the circuit court made three errors: 1) that the court "failed to take full account of Brooks's payments" since Council filed the last lien; 2) that he is entitled to attorneys' fees for "records and amounts excluded by the court"; and 3) that the court erred in not granting Brooks attorneys' fees under Maryland Rule 2–424(e). We shall consider each of these contentions individually.

*1. Circuit Court's Assessment of Amount Due Under Lien*

Brooks argues that, when assessing the amount due, the circuit court did not accurately consider all of the pay-

ments he had made to Council. Brooks contends that, prior to the lien being established, he made payments totaling $4,083.50 on a balance due of $5,472. Thus, according to his calculations, he only owed $1,389 to Council, and the circuit court erred in determining that $3,411 (plus interest and costs) was the amount due. As indicated above, we review factual findings by the court under a clearly erroneous standard. *Liberty Mut. Ins. Co.*, 154 Md.App. at 609, 841 A.2d 46.

Brooks asserts that he made various payments in 1995 that should have been applied to the balance due for his 1995 lien. As the proponent of this argument, Brooks has the burden of proving its truth. *Bradley v. Hazard Technology Co., Inc.*, 340 Md. 202, 205, 665 A.2d 1050 (1995); *Myers v. Estate of Alessi*, 80 Md.App. 124, 140, 560 A.2d 59 (1989). To support his position, he directs us to a spreadsheet indicating when certain payments were made.

The spreadsheet does not demonstrate the relationship of the payments to any outstanding obligations. Furthermore, based on an independent review of the record, we cannot determine whether the payments made by Brooks in 1995 represented payment on the 1995 assessment or went toward a previous year's assessments, interest, or fees.

Moreover, the lien foreclosed, as the court explained in the July 6, 1999 hearing, in this case was established, without contest, for $3,411. Therefore, in addition to any interest or late fees properly accruing, that was the underlying amount deemed to be owing.

[The amount due] included the lien that was in this court that gave rise to all of this. There may be something that could come later as interest that would be due, but the lien that was in the file in the court that he failed to deny, and therefore, it became this, that was the lien that I understood at that time to have been offered.

We are not persuaded that the circuit court was clearly erroneous in its determination that the amount due for the 1995 and 1996 assessments was $3,411, exclusive of interest, costs, and late fees.

## II. Attorneys' Fees for "Records and Amounts Excluded by Court"

Brooks contends that, pursuant to the GCA governing documents, he should have been awarded attorneys' fees for "100%" of his billed services, and not just the percentage reflecting GCA related costs. Brooks argues that Council's Declaration and Bylaws should "yield to the [GCA] Declaration of Covenants, and should be construed against [Council] as the drafter of all three instruments," and, therefore, the circuit court erred in only awarding him attorneys' fees for work attributable to GCA's assessments. (Footnotes omitted.) In light of our determination that Brooks was not the prevailing party in the proceeding, he is not entitled to attorneys' fees under the GCA documents. Thus, Brooks's proposition is, for the purpose of this opinion, academic.

Had Brooks been the prevailing party, however, we would disagree that the GCA Declaration controls the award of attorneys' fees for non-GCA related matters. As we have discussed above, Brooks is a member of two associations, each of which is governed by separate documents. The GCA Declaration applies to GCA assessments.

## III. Attorney's Fees under Maryland Rule 2–424(e)

Finally, Brooks contends that the circuit court erred in refusing to award him attorneys' fees under Maryland Rule 2–424(e) for the $52,795.54 in costs he incurred in proving the value of his condominium unit. That rule states:

(e) **Expenses of failure to admit.** If a party fails to admit the genuineness of any document or the truth of any matter as requested under this Rule and if the party requesting the admissions later proves the genuineness of the document or truth of the matter, the party may move for an order requiring the other party to pay the reasonable expenses incurred in making the proof, including reasonable attorney's fees. The court shall enter the order unless it finds that (1) an objection to the request was sustained pursuant to section (c) of this Rule, or (2) the admission sought was of

no substantial importance, or (3) the party failing to admit had reasonable ground to expect to prevail on the matter, or (4) there was other good reason for the failure to admit.

On remand from this Court, it was necessary for the circuit court to determine the fair market value of the unit in assessing whether the first sale "shocked its conscience." Brooks argues that, in his request for admissions, he asked Council to admit to the fair market value of the unit. Council refused, but at the hearing, it produced no evidence of its own valuation. Brooks contends that, because there was ultimately no dispute over the fair market value, Council should bear the burden of any costs associated with proving the fair market value of the unit.

At the July 6, 1999 hearing, the circuit court denied Brooks's request for costs pursuant Rule 2–424(e), stating:

I would have ordered in any case that there be some sort of certified appraisal, as I do in all of these cases, some certified appraisal, and we have required certified appraisals ever since the savings and loan debacle, because that was the very basis of how the savings and loan companies went bankrupt. There were falsified and inflated appraisals for property, and the State then came up with certified appraisers, and this court, ever since then, in all of the guardianship cases in this court, in all of the foreclosure cases in this court, whenever that becomes an issue, we get certified appraisals. Then we know we are solid.

 In effect, the court was saying that any admission sought was of no ultimate importance because, even if the parties had agreed on a value, the circuit court could not be assured that the value assigned by the parties was indeed accurate. As we explained in *St. James Const. Co. v. Morlock*, 89 Md.App. 217, 230, 597 A.2d 1042 (1991), "ultimate issues of fact" are not appropriate subjects for a request for admission under Rule 2–424(e). A certified appraisal was the more appropriate way to make that determination and prevent "falsified and inflated appraisals for property." Furthermore, it is difficult to understand how $52,795.54 in costs to prove

the fair market value of a condominium unit could be reasonable. Therefore, we are not persuaded that the circuit court erred or abused its discretion in refusing to award attorneys' fees under Maryland Rule 2–424(e).

## POST ARGUMENT MOTIONS

Finally, after oral argument, Brooks petitioned that we award him costs for various transcripts that he ordered for use in this case.[17] Traditionally, costs are assessed in the mandate. *See* Maryland Rules 8–606 and 8–607. Accordingly, Brooks may submit to the Clerk his costs for transcripts that were ordered and used for this appeal. The Clerk will compute costs in accordance with Maryland Rule 8–608 and the mandate in this case.

**JUDGMENTS VACATED IN PART AND AFFIRMED IN PART. JUDGMENT AS TO INTEREST DUE VACATED AND REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. JUDGMENT AS TO ATTORNEYS' FEES VACATED. ALL OTHER JUDGMENTS AFFIRMED.**

**COSTS TO BE PAID ½ BY APPELLANT/CROSS APPELLEE AND ½ BY APPELLEE/ CROSS APPELLANT.**

---

17. Specifically, Brooks requested that he be credited for the costs of the following transcripts: March 7, 1997 circuit court hearing; August 28, 1998 circuit court hearing; November 4, 1998 circuit court hearing; December 8, 1998 circuit court hearing; January 28, 1999 circuit court hearing; May 27, 1999 circuit court hearing; and July 6, 1999 circuit court hearing.